222 N.J. Super. 602 (1988)
537 A.2d 774
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
GARY STEVENS, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted November 25, 1987.
Decided February 19, 1988.
*604 Before Judges FURMAN, BRODY and SCALERA.
Alfred A. Slocum, Public Defender, attorney for appellant and cross-respondent (Thomas R. Ryan, Designated Counsel, of counsel and on the brief).
W. Cary Edwards, Attorney General, attorney for respondent and cross-appellant (John J. Scaliti, Deputy Attorney General, of counsel and on the brief).
The majority opinion of the court was delivered by SCALERA, J.A.D.
*605 Defendant was a Westampton police officer who appeals his jury convictions for two counts of second degree official misconduct contrary to N.J.S.A. 2C:30-2(a), (counts one and three) and one count of third degree criminal coercion contrary to N.J.S.A. 2C:13-5, (count two). He was sentenced to consecutive three year terms of imprisonment on counts one and three, a concurrent 18-month term on count two and was required to pay an aggregate fine of $22,500 as well as a $75 penalty to the Violent Crimes Compensation Board.
Defendant was indicted and tried on the basis of two incidents one of which occurred on January 1, 1982[1] involving one Jeanette Potter and the other on February 22, 1982 involving one Jane A. Petroski. The evidence involving those offenses indicated the following:
On January 1, 1982 Jeanette Potter, along with her sister and brother-in-law, visited Roy Smitherman at the Howard Johnson Motel in Mount Holly. After driving away, they were stopped by policemen, including defendant and escorted back to the motel. After a search of the purses of Potter and her sister all were taken to Westampton police headquarters. There Potter gave a written statement to defendant. He then left the room with the statement, returned, locked the door and advised her that she was being detained in connection with a drug investigation of Smitherman. Potter denied being in possession of any drugs but defendant insisted that he had to search her for needle marks. He looked at her arms and advised Potter that because some people shoot drugs in their stomach he had her remove her blouse. He then told her to expose the rest of her stomach which she did so by letting her pants fall. Defendant told her that if she proved she was not a drug addict, he would *606 let her entire group go home. Eventually, defendant did release all of them.
Defendant testified at trial that he recalled arresting Potter but denied that he attempted to search her or required her to undress. He said that he went to Potter's residence subsequent to the incident to obtain more drug information from her. Defendant claimed that Potter never accused him of having strip searched her.
On February 22, 1982, Patrolman Michael Mahalachek of the nearby Willingboro Township Police Department issued a ticket to Jane Anne Petroski at approximately 3:40 a.m. for going through a red light. She produced her credentials and because he smelled no odor of alcohol on her breath Mahalachek released her. Subsequently Mahalachek learned that Petroski had been driving while on the revoked list so he issued her another ticket and went to Westampton Police Station where he had been informed she was. Since the parking lot there was deserted, he left the summons on her car dashboard.
Actually, Petroski had run out of gas near the Westhampton police station and had coasted into the parking lot to use the emergency phone to get help. Burlington County Central Communications issued a radio message that there was a stranded female at the station. Defendant and his rookie partner, Officer Harvey Montijo, as well as several other officers, heard the dispatch on their way to the Burlington City Diner for breakfast. Defendant told Montijo to continue on and that he would answer the call.
Upon arriving at Westampton police headquarters, defendant asked Petroski for her driving credentials. She acknowledged that she had been drinking so he took her inside to perform balance tests. After she performed them he told her she had failed and would have to be searched. He picked up the phone to call a matron, but Petroski never actually saw him dial it. He then told her it would be a long time before someone could perform the search. Petroski was frightened and asked if *607 defendant could perform the search, not realizing it would involve undressing. Petroski had not been informed that she was under arrest. Initially, he had her remove her socks and boots. Defendant then told her he wanted to see if she had anything between her breasts and requested that she take off her shirt. She did not know what to do, but gathered up her shirt, not removing it. Defendant then told her he had to see if she had anything taped between her legs. He instructed her to drop both her jeans and panties. She complied out of fear of him and of losing her driver's license. He then made her sit in a chair facing him with her legs spread; then, standup, bend over and spread her legs again. After she dressed defendant told her he would not remove her license for driving while intoxicated but would issue her a ticket for driving while on the revoked list. However, defendant never issued such a summons. Thereafter, defendant then drove Petroski home. As she got out of the car, he said, "Don't screw me and I won't screw you."
The defendant's version of the Petroski incident was that he had seen a vehicle speeding down Rancocas Road but did not stop it. Subsequently, that same car broke down and defendant received a call regarding the disabled vehicle. He went directly to headquarters and met with the driver, Petroski. She produced driving credentials but she had blood on her hands and a rear window was broken; she indicated that she had been in a fight at the Washington House and that someone had broken her window. However, Petroski said that she did not want to report it because, "all pigs are the same."
Petroski asked the defendant if she could use the bathroom inside headquarters, so he let her in. He then called the dispatcher and found out that Willingboro Police had stopped Petroski earlier but had let her car go, not knowing that she had been driving on the revoked list. When Petroski came out of the bathroom, he asked her if she wanted to take a breathalyzer test since she looked like she was drunk. She asked to make a telephone call, adding that she wanted to call an *608 assistant prosecutor for whom her mother worked. Instead, the defendant told Petroski that he would not give her a ticket but would give her a ride home.
He was in the station with her about 15 minutes and in the parking lot for an equal amount of time. Petroski told him that he was a "really nice guy" for driving her home. He denied touching or searching her in any way. However, she had invited him to look into her purse. When he did he saw a small bag of marijuana which he had her dump in the parking lot. While this was going on, Montijo had been at the Burlington Diner eating breakfast with some other local policemen.
At one point defendant had communicated with Montijo and requested his assistance. The defendant eventually decided not to issue a summons to Petroski because of the various personal problems she mentioned as well as the tickets which had previously been issued to her that evening from the Willingboro Police. Eventually he decided to take Petroski home at 4:45 a.m. when Montijo failed to show up.
The incident came to light when Petroski subsequently called her stepmother, her father and her sister the same day and told them of the incident. Later that morning, Petroski's mother reported it to the Chief of the Westhampton Police Department, Russell Minuto. As a result, Chief Minuto telephoned defendant and questioned him concerning the incident. Defendant denied the allegations claiming that the girl was drunk or under the influence of drugs. Defendant insisted that Montijo was with him at all times and could verify his account of what had transpired.
After he had been contacted by Chief Minuto, defendant telephoned Montijo and advised him of the Chief's call and that he had advised the Chief that Montijo was present with him at the station with the girl. Defendant then requested that Montijo verify his version should the Chief inquire but Montijo refused.
*609 Defendant testified that subsequently the Chief told him that the complaint was not being pursued any further. He denied requesting Montijo to lie for him. He added that the Chief also told him that Petroski's mother had called him back later and said that if her daughter had taken her clothes off, she had done so willingly. He denied ever telling the Chief that Montijo had been with him the entire time that he was with Petroski.
On April 30, 1982, defendant was arrested by members of the Burlington County Prosecutor's Office concerning the strip search of Petroski. On May 20, 1982, defendant was again arrested, this time as a result of a complaint concerning the strip search of Potter. On that day, after being advised of his rights, defendant told Captain Neil Forte of the prosecutor's office, "off the record, Neal, I hear you're the guy that's trying to stick it up my a____. What's it going to take to get me out of this?" Defendant then offered to resign from the police department or plead guilty to a disorderly persons offense if Forte would terminate the investigation. Forte advised defendant that he could not speak to him with respect to the case since defendant had not waived his rights, and that Forte could not get involved in any type of plea bargaining.
Defendant's version of the post arrest discussions was that he never indicated a willingness to resign or plead guilty to a reduced charge. Rather, he said he was informed that if he resigned the charges would be dismissed. However, he refused to accept this offer. Defendant said the prosecutor's office had specifically advised his attorney that the indictment would be dismissed if the defendant resigned from the Westhampton Police Department, agreed never again to seek employment with any law enforcement agency and executed releases with respect to potential civil liability. The defendant again refused.
During the trial concerning the two incidents forming the basis of the charges in the indictment, the State sought to introduce evidence of three other similar incidents involving the defendant in his position as a police officer. Two of those *610 incidents occurred prior to the Petroski and Potter incidents while one occurred between those two dates.

A.
In mid August 1979, Brenda McCabe was stopped by defendant at approximately 2:55 a.m. He asked for her driver's license and identification without informing her of the reason for the stop. He noted that she had produced an invalid insurance card and told her to follow him to the nearby Howard Johnson motel. There defendant removed from her pocket a pack of cigarettes which contained two marijuana joints.
Defendant then had her sit in his patrol car, told her she was in a lot of trouble, and asked "what are you going to do about this." Defendant, who is black, said something about getting a "white piece of a____." At that point, McCabe realized that defendant was asking her to engage in sex. McCabe feared that defendant would charge her with several offenses. Defendant instructed her to follow him in her car to police headquarters. Instead, he turned down a dirt road and she followed thinking she was under arrest. Defendant then got into her car and had sexual intercourse with her on the front seat. He returned the marijuana to her, did not issue any summonses and released her.
McCabe drove to the home of her estranged husband and complained to him and a visitor that she had just been raped by a black officer in Westhampton whose name tag read, "Stevens." However, McCabe declined their advice to report it to the police because she felt that the complaint would not be pursued by other officers. She saw defendant a year later when he again stopped her and issued her a summons. At that time she said, "You're the cop that raped me." He responded, "You'll never prove that." McCabe explained further that she didn't tell the police about the rape for three years because of the trauma a trial might cause her. However, a news photograph *611 of defendant published in connection with similar incidents prompted her to change her mind.
When defendant testified he denied all of McCabe's allegations, recollecting only that he had issued her a summons in October 1980, and that she had complained to him that a cop from Westhampton had raped her. He said that he noted her comment that policemen in Westhampton were "jerks," on his copy of the ticket.

B.
In October or November of 1981 Montijo was a new cop assigned to night patrol with defendant in order to gain experience. Defendant suggested that they "go look for some parkers." Montijo drove up a dirt road and stopped about 25 yards from a parked vehicle. As both officers approached it two female heads appeared from the back seat. When they got out of the car, the lower garments of the older female, about 20 years of age, were around her ankles; the younger girl, about 16, was naked on top. When defendant asked for identification the older girl began to pull up her pants, but defendant told her to "leave your pants down." Defendant turned over their identification to Montijo and instructed him to return to the patrol car and write down the details. While in the patrol car, Montijo noticed that the younger girl was dropping her pants. He got "pretty upset" so he went over to defendant to ask what was going on. Defendant claimed that he was checking for weapons and drugs. When Montijo expressed disbelief defendant told him to return to his task in the car. After finishing, Montijo returned and heard the defendant say that he had conducted a search because the area was a high crime area which Montijo knew to be untrue. The younger girl was crying and pleaded with defendant not to arrest them. Defendant told them he would not do so at that point, but warned that they should stay out of the area.
*612 Afterward, Montijo expressed his disapproval to defendant. Defendant commented that this was "some of the fringe benefits of the job." Montijo did not report the incident immediately since he had been on the force only a few months and did not know whom to trust.
At trial defendant testified concerning this incident. He denied that he ever attempted to search either girl or requested that they take off any clothing. In fact, he told them to get dressed. When the computer check that night revealed nothing, defendant told the girls to leave and never return to the area. He said Montijo never indicated any discomfort over the incident, nor did he accuse him of doing anything improper.

C.
During mid-February 1982, Paula Jones spent the night at the Howard Johnson Motel in Mount Holly where she was employed. She knew defendant as a patron. As he was entering the restaurant on his break at about 2:00 a.m., she was leaving with two male friends. One stayed with her in the room while the other went home. Shortly after seeing her exit the restaurant, defendant left, telling another patron that he was going "to check it out" and see where she was going. He returned about 15 minutes later and said he had observed movement in a motel room, but could not see anything else. Then, he indicated, he was going back to the room to get himself "a piece of a____."
The next night at about 11:30 p.m. while she was at work defendant confronted Jones and told her she was in a lot of trouble because he observed her drop some marijuana in the restaurant a few nights earlier and knew that she had stayed over at the motel.
Defendant told her that he had seen her with two men through the motel window when he had investigated a complaint about excessive noise. When he had returned to headquarters he had explained that he did not want to arrest her *613 because of her job as an assistant manager. He then told her that Chief Minuto had instructed him to call and inform her employer of the type of person working for them. Minuto denied ever making such a request. Defendant then told Jones that he had taken care of it, that she would not be arrested but that he was in trouble for protecting her. When Jones insisted that she wanted to speak to Minuto because the various charges were false, defendant told her not to worry about it. Defendant then said that he had seen her through the window and that she looked better with her clothes off and made other remarks to her suggesting that he expected sexual favors from her.
Concerning this incident defendant claimed that he had been summoned to Howard Johnson's in response to a request for police help to remove an employee. He arrived at 11:30 p.m. and was told by Jones and others that another female employee was refusing to follow the restaurant's policy of removing her jewelry. Defendant said he left after attempting to work out a compromise. He denied that any of the incidents to which Jones had testified had occurred.
After conducting an extensive hearing under Evid.R. 8 concerning the three incidents not the subject of the criminal charges against the defendant, the trial judge ruled that they were admissible as evidence against the defendant. He determined that the incidents clearly and convincingly had occurred, that they were admissible under the exceptions noted in Evid.R. 55 and that, under Evid.R. 4 their probative value outweighed any consequent prejudice to the defendant.
On this appeal defendant raises three issues,
Point I: The trial court erred by misapplying the provisions of Evidence Rule 55 when justifying the admission of other crime evidence against the defendant.
Point II: The trial court erred in precluding the defense from calling a witness on the defendant's behalf.
Point III: The trial court abused its sentencing discretion by imposing consecutive three-year terms on the third degree offenses in light of the statutory presumption of probation, as well as by imposing the maximum possible fines on each offense.
*614 We granted the State's motion to file a cross-appeal nunc pro tunc. It asserts that the trial judge erred in his post-conviction determination that defendant's two convictions for second degree official misconduct should be entered as third degree offenses and for imposing sentences appropriate to such lesser offenses.

I.
Defendant urges that the trial judge erroneously admitted evidence of the other incidents which were not a basis for the criminal charges. According to defendant's argument, the jury was thus permitted to infer therefrom that he was of poor character and generally had a predisposition to commit crimes or offenses.
Evid.R. 55 provides:
... Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
This rule prohibits the admissibility of other crimes simply to show that the defendant had a propensity to act in a certain way. State v. Kociolek, 23 N.J. 400, 419 (1957). However, the rule expressly does allow the admission of such evidence to prove other facts in issue such as motive, intent, plan, state of mind, identity or absence of mistake or accident. Evid.R. 55.; State v. Garfole, 76 N.J. 445, 450 (1978), appeal after remand, 80 N.J. 350 (1979). If the admission of such evidence is in dispute, the judge must hold an Evid.R. 8 hearing at which the offering party must prove the occurrence of the other crime by clear and convincing evidence. State v. Wilson, 158 N.J. Super. 1, 10 (App.Div. 1978), certif. den. 79 N.J. 473 (1978).
It is axiomatic that the intent of Evid.R. 55 is exclusionary. State v. Garfole, supra, 76 N.J. at 450. It is primarily designed to protect defendants from the potential prejudice inherent *615 in such evidence. State v. Peltack, 172 N.J. Super. 287, 292 (App.Div. 1980), certif. den. 84 N.J. 474, 475 (1980). This prejudicial effect springs from a jury's natural tendency to find a person guilty of a crime when presented with evidence that the accused has committed a similar crime. Ibid.
Generally speaking, "other crimes evidence" can only be admitted to prove a real issue in the case. Evid.R. 55; State v. Peltack, supra, 172 N.J. Super. at 293; State v. Niemeyer, 195 N.J. Super. 559, 564 (Law Div. 1984); Accord, State v. Atkins, 78 N.J. 454, 462 (1979). The issue should relate to an element of the offense projected or raised by the defendant before or during trial or by the evidence. State v. Peltack, supra, 172 N.J. Super. at 293. It has also been observed that the enumerated exceptions listed in the rule are only illustrative. State v. Hummel, 132 N.J. Super. 412, 425 (App.Div. 1975), certif. den. 67 N.J. 102 (1975); State v. Kociolek, 23 N.J. at 418-419.
After listening to all of the testimony adduced at the Rule 8 hearing the trial judge heard extensive oral argument concerning its admissibility. He relied principally upon the language of this court in State v. Hummel, supra, and concluded that such incidents had occurred by clear and convincing proof and were admissible to show the defendant's "state of mind and attitude as to sexual behavior with the females" as a police officer on duty, the probative value of which outweighed any prejudice to the defendant.
At the conclusion of the entire case the trial judge further specifically instructed the jury concerning the limited purposes for which it could consider such evidence.
Now, what about the other three incidents which we permitted you to hear about? ... I permitted this, not to show  and it doesn't show that the defendant is a bad person  not to show that he was generally disposed to commit these crimes against Potter and Petroski. On the other hand  and you may not deduce from hearing about these other three incidents that he's a bad person or that he generally was disposed to commit these two offenses. But it's made known to you to show his intent toward Potter and Petroski, or his plan regarding young women coming under his control while he was carrying out his official duty, period. Or, in other words, to show his attitude toward or *616 his relationship to these young women, or, finally to  to show his state of mind toward young women coming under his control with respect to his own sexual desires. [Emphasis added].
Defendant took exception to this portion of the charge because he perceived it as an enlargement of the purposes for which such evidence was admitted and as introducing issues not framed by the evidence. Our primary inquiry is directed to whether the evidence in question rationally and logically tended to bear on a real issue in this case as suggested by the exceptions enumerated in Evid.R. 55.
On appeal, defendant argues that the three prior incidents are so dissimilar as to be irrelevant to establishing intent and that evidence of defendant's state of mind is inadmissible since it is not a disputed issue in light of defendant's denial of the incident. Further, defendant argues that where a defendant denies committing the charge, the issue for the jury is credibility, not state of mind or intent. See State v. Ascolese, 59 N.J. Super. 393, 398 (App.Div. 1960). We do not fully agree with such an analysis.
State v. Hummel, supra, involved a foster father convicted of contributing to the delinquency of two minor girls, carnally abusing them and impairing their morals which defendant denied. This court affirmed the admission of testimony from a different ward of defendant's to the effect that he had also sexually abused her, as relevant to show his state of mind toward the other two victims. 132 N.J. Super. at 425-26. We specifically found that the relevance of this testimony outweighed the risk of prejudice to the defendant. Moreover, because other substantial evidence of guilt existed, the prior bad act testimony was admitted despite the trial court's failure to give a limiting instruction to the jury that the testimony was admitted only for the purpose of showing state of mind. Conversely, in the instant matter, the trial judge did give a proper limiting charge. Evid.R. 6.
Prior instances of child abuse unconnected with the cause of an infant's death are admissible under Evid.R. 55 to show *617 intent or absence of mistake or accident. State v. Wright, 66 N.J. 466 (1975), rev'g on dissent, 132 N.J. Super. 130, 147 (App.Div. 1974). Similarly, in State v. Kent, 173 N.J. Super. 215 (App.Div. 1980), we overturned a trial court ruling which severed three counts of unauthorized placement of a child for adoption for separate trials. We noted that "a common thread binds [these offenses] together, evidencing such a course of conduct on the part of defendant as to make evidence of the commission of one unauthorized placement relevant as to either or both of the others in order to establish motive, intent or common scheme or plan." Id. at 220. It follows that the fact that defendant was not charged with crimes emanating from the other three incidents does not, in and of itself, bar evidence thereof. Such evidence is admissible if relevant to a genuinely contested issue at trial. State v. Attanasio, 92 N.J. Super. 267 (App.Div. 1966), certif. den. 48 N.J. 354 (1966); State v. Kozarski, 143 N.J. Super. 12 (App.Div. 1976), certif. den. 71 N.J. 532 (1976).
Broadly speaking then, evidence of another crime is proper where it is demonstrated to be relevant to the issue of defendant's guilt of the crime charged. State v. Campisi, 47 N.J. Super. 455, 459-460 (App.Div. 1957), certif. den. 26 N.J. 304 (1958); 1 Wharton's Criminal Evidence (13th Ed.), § 241 at 536. The author in the latter treatise has noted that this approach permits evidence of other crimes to show a variety of factors such as intent and motive. Id., § 245 at 554, § 247 at 561. Evidence of plan, design or scheme becomes admissible when it tends to establish "a common plan, design, or scheme embracing a series of crimes ... so ... that proof of one tends to prove the other." Id., § 248 at 565.
In the case at hand, the proofs offered were clearly relevant to support the State's theory that defendant had engaged in a continuous or repeated course of conduct in which he had used his position as a police officer to intimidate hapless females if they did not submit to degrading sexual acts to *618 satisfy or gratiate his prurient interests. The proofs surrounding these other incidents show clearly that on each of these occasions the defendant had acted in accordance with the same common plan, design or scheme to commit such criminal acts. He did so whenever he encountered a female arrestee under circumstances that would allow him to engage in this type of sordid behavior undetected. Such evidence also tended to establish his state of mind that he possessed the authority to lodge false criminal prosecutions thus enabling him to threaten his victims if they refused his advances.
In our view such evidence presented a classic example of the types of admissible evidence contemplated by the suggested exceptions in Evid.R. 55. It logically and persuasively tended to show that defendant had repeatedly committed such misconduct while acting under color of his office and had knowingly and intentionally done so on occasions other than the instances involved in the crimes charged. In other words, the criminal acts all emanated from the opportunity afforded to him by virtue of his position as a police officer. Thus, the evidence was relevant precisely because it did tend to show his guilt of the two similar offenses for which he was being tried. State v. Campisi, supra, 47 N.J. Super. at 459-460.
Moreover, the trial judge correctly charged the jury to limit its consideration of such proof as tending to show defendant's intent to commit a crime as opposed to his having executed a lawful police function as he had claimed and that such activity was characterized by a common plan, design or scheme involving females as the object of his nefarious actions. Finally, the proof also tended to show that he had committed these acts knowingly on other occasions and therefore did so on the dates charged in the indictment establishing his state of mind toward such victims when the opportunity did arise.
Our dissenting colleague takes issue with our conclusion through his analysis of the cases which have previously dealt with those same Evid.R. 55 labels and concludes that the *619 evidence of the other incidents here merely served to prove defendant's predisposition to commit other "wrongful acts" similar to the crime with which he is charged. However, that analysis fails to take into account the origin of this evidence rule and its specific provisions.
We are not opting for a rule which would permit the State to "routinely present evidence that a defendant committed crimes or bad acts on earlier occasions that were similar to the crime with which he is charged." However, we do subscribe to the well established principle, as codified by the exception noted in Evid.R. 55, that such evidence is admissible if it logically and rationally tends to be relevant to a fact in the case which the State must prove in circumstances where the probative value of such evidence will not create undue prejudice or confusion or involve an undue consumption of time. Evid.R. 4; State v. Campisi, supra. To follow the dissent's reasoning to its logical conclusion, the exceptions provision of the rule would be effectively emasculated in almost all cases because the argument that such evidence will also tend to show the defendant's general predisposition to commit crimes in general is always applicable. This reasoning was considered and rejected as evidenced by the exception having been engrafted into the rule.
Here the State was obligated to prove that defendant had committed the misconduct and coercion intentionally and that he had not done so based on some mistaken impression or happenstance. The other crimes evidence was relevant as supporting proof of such elements of the offenses.
In sum, the evidence properly was admitted under the exceptions suggested by the language of Evid.R. 55.

II.
On cross-examination, Montijo, denied having been fired by defendant prior to the time when he had become employed as a policeman. The defense sought to call one Leonard Goldman at the "eleventh hour" to testify that defendant had indeed fired Montijo and to show that the witness harbored a bias toward *620 the defendant. The State objected on several grounds including the fact that because defendant had not supplied Goldman's name as a witness as required by the rules governing discovery. The trial judge specifically related several reasons why the witness should not testify and upheld the State's objection.
R. 3:13-3 governs the respective rights of the parties here. It imposes a continuing duty on the part of each to disclose the names and addresses of potential witnesses. While we have recognized that a defendant cannot be required to disclose the name of every person who comes to his attention as a potential witness, the defendant is bound to furnish such information where he knows that the person will definitely be called as a witness. Matter of Lependorf, 212 N.J. Super. 284 (App.Div. 1986). The sanctions for such failure normally lie within the trial judge's discretion. State v. Burnett, 198 N.J. Super. 53, 60 (App.Div. 1984), certif. den. 101 N.J. 269 (1985).
Our review of this record satisfies us that, early on, the trial judge had warned of the sanctions that would follow if there was any late amendment of such discovery information. In light of the defendant's attempt to call this witness on a collateral issue just before the testimony had been completed, coupled with the normally wide discretion accorded to trial judges in such cases and the detailed reasons cited by him for precluding such testimony, it is apparent that no error was committed. Cf. State v. Burnett, supra. In any event we do not find that the exclusion of the proffered evidence was "capable of producing an unjust result" in this case. R. 2:10-2.

III.
Turning our attention to the sentencing issues raised by defendant on his appeal and by the State in its cross-appeal, we need not tarry long.
Defendant complains of both the excessiveness of the sentences relating to the misconduct convictions because of the imposition of consecutive custodial terms and the total amount of the fines levied. The State argues that the trial judge erred *621 in sentencing defendant for third degree offenses instead of second degree offenses with respect to the misconduct convictions.
We have carefully examined defendant's contentions in light of the guidelines indicated in State v. Roth, 95 N.J. 334 (1984) and State v. Hodge, 95 N.J. 369 (1984) and conclude that even if the trial judge had correctly designated the misconduct charges as crimes of the third degree, there is no reason for us to disturb the sentences imposed.[2]
With respect to the State's assertion that the trial judge erred in downgrading the misconduct convictions from second degree offenses to third degree offenses thus implicating the statutory presumption of incarceration, we agree. See State v. Phelps, 187 N.J. Super. 364, 373 (App.Div. 1983), aff'd 96 N.J. 500 (1984). However, we note that the State did not specifically object to this downgrading at the time of sentencing. Indeed, the trial judge observed that it took "no serious position" on that issue. Moreover, the State did not call the trial judge's attention to our holding in State v. Phelps, supra, at that time.
In any event, in light of the fact that defendant has already served the custodial portion of his sentence and is presently on parole we see no reason to attempt to work any effective change in the prior sentences and to require defendant to be resentenced by the trial judge. Cf. State v. Heisler, 192 N.J. Super. 586, 592 (App.Div. 1984). Instead we invoke our authority to modify the sentences at this level to correct the judgments to indicate two second degree convictions for misconduct. With respect to those convictions as corrected we hereby impose concurrent six year custodial sentences on each count (one and three) together with a $22,500 fine and a $25 Violent Crimes Compensation Board penalty on each of those two counts. With this, the illegality of the trial judge's downgrading *622 is corrected and a sentence in compliance with N.J.S.A. 2C:43-6(a)(2) is imposed while preserving defendant's present parole status. However, we do direct that the trial court correct the judgment of conviction to reflect our resentencing for second degree offenses on the misconduct charges instead of third degree crimes under counts one and three. R. 2:10-3. The sentence previously imposed on count two is affirmed.
In all other respects we affirm the defendant's convictions.
BRODY, J.A.D., dissenting.
In my view there must be a new trial because defendant was convicted on the basis of evidence of his wrongful conduct that was erroneously admitted by the trial judge, contrary to Evid. R. 55, to prove his predisposition to commit the crimes with which he was charged. Relying upon this court's holding in State v. Hummel, 132 N.J. Super. 412 (App.Div. 1975), certif. den. 67 N.J. 102 (1975), the trial judge ruled that evidence of three wrongful acts was admissible to show defendant's "state of mind and attitude as to sexual behavior with the females." That ruling, made at the outset of the trial, shifted the focus of the trial from whether defendant committed the crimes charged to whether he committed those three wrongful acts.
The entire first day of trial was devoted to testimony related to defendant's alleged "peeping Tom" offense against Paula Jones, the State's first witness. The entire second day of trial was devoted to testimony related to defendant's alleged rape, almost three years before the crimes alleged in the indictment, of Brenda McCabe, the State's first witness that day. The first third of the third day's testimony related to the McCabe incident; the rest to the Potter crimes charged in the indictment. The fourth day's testimony was devoted to the Petroski crimes charged in the indictment. Most of the fifth day's testimony, the last day of the State's case in chief, was devoted to the "lovers' lane" incident.
The defense, which included defendant's testimony, was devoted mainly to denying the three offenses for which defendant *623 had not been indicted and attacking the motives of those who testified against him regarding those offenses. By far the greatest portion of the legal argument during trial was devoted to the admissibility of this disputed evidence and the propriety of defendant's efforts to discredit it.
The facts in Hummel differ significantly from the facts here. The defendant there was indicted for committing sexual offenses against two of three young sisters in his foster care. The issue was whether Rule 55 barred evidence that during the same period that the defendant allegedly committed the offenses charged in the indictment he also committed similar offenses against the third sister. In ruling that the evidence was admissible the court said:
The testimony of C, a foster home ward in defendant's home during the same period that D and R were there, was admissible to show defendant's state of mind and attitude as to sexual behavior with his wards. The criminal acts testified to by C were so related to the crimes charged against defendant as to time, place and circumstance as to evidence a continuous state of mind with respect to the acts for which he was being tried. See State v. Sinnott, 24 N.J. 408, 413-414 (1957). The fact that C was not mentioned as a victim in any indictment against defendant for the acts testified to is of no moment. [State v. Hummel, 132 N.J. Super. at 425.]
It cannot be said that the three wrongful acts testified to here "were so related to the crimes charged against defendant as to time, place and circumstance as to evidence a continuous state of mind with respect to the acts for which he was being tried."
Moreover, the Hummel court relied on State v. Sinnott, which was decided before the adoption of Rule 55. Its holding is therefore questionable even on its own terms. Sinnott was indicted for an act of sodomy against a young boy. Another boy testified that "immediately prior to the commission of the offense" charged in the indictment, Sinnott committed a similar act upon him. The court held that Sinnott's acts were "part of the res gestae" and therefore admissible. The court continued:
[W]here the commission of a former crime evinces a state of mind that is carried forward and is shown to exist at the time of the commission of the crime charged, and the former crime is so related to the crime charged as to time, place and circumstances that the state of mind may be said to be continuous, evidence of the former crime is admissible. [State v. Sinnott, 24 N.J. 408, 413-414 (1957).]
*624 The Rules of Evidence, adopted in 1967, discarded the imprecise concept of "res gestae" as a test for the admissibility of evidence. In comments to Rule 55 the Review Commission states, "It is debatable whether another crime's merely being part of the res gestae should qualify it for admission to evidence." Evid.R. 55, comment 10 (Anno. 1987). The Review Commission specifically comments that there is no reason for excepting evidence of certain sex offenses from the exclusionary principle of Rule 55:
Another area where other crime evidence has readily been admitted [in pre-1967 cases] is in certain types of sexual offense cases. [Citations omitted.] It is not clear whether this exception to the exclusionary principle of Rule 55 is still viable. What particular relevance is there of other crimes in a sexual offense case that is not present in other cases? If all the evidence shows is a predisposition toward engaging in certain forms of sexual endeavor, should not the evidence be excluded under Rule 55? [Evid.R. 55, comment 10 (Anno. 1987).]
The trial judge included in his main charge to the jury a limiting instruction with respect to the disputed evidence. His effort to explain the proper and improper uses of such evidence was understandably halting and contradictory:
All right, those are the charges. Now, what about the other three incidents which we permitted you to hear about? The McCabe incident. The Jones incident. The girl that worked at Howard Johnson. The incident of the two girls out in the lover's lane. All right. I permitted this, not to show  and it doesn't show that the defendant is a bad person  not to show that he was generally disposed to commit these crimes against Potter and Petroski. On the other hand  and you may not deduce from hearing about these other three incidents that he's a bad person or that he generally was disposed to commit these two offenses. But it's made known to you to show his intent toward Potter and Petroski, or his plan regarding young women coming under his control while he was carrying out his official duty, period. Or, in other words, to show his attitude toward or his relationship to these young women, or, finally to  to show his state of mind toward young women coming under his control with respect to his own sexual desires.
* * * * * * * *
These other three incidents are shown to you simply for you to consider in your mind whether they show with respect to Potter and Petroski his intent or plan, his attitude or relationship toward these young women coming under his control.
It is hard to imagine how the jury could have reconciled contradictory instructions that they were not to consider the *625 other incidents as evidence that defendant was "generally disposed" to commit strip searches of women in his control, but could consider them as evidence that he had an "attitude," "intent," "plan" or "state of mind" to commit strip searches of women in his control.
The majority endorses the trial judge's effort to justify admission of the evidence by mislabeling it as acknowledged exceptions to Rule 55.
Initially the majority mislabels the evidence as proof of "the same common plan, design or scheme to commit" the crimes charged. The "plan" exception to the rule requires that the "other crimes" have been "committed for the accomplishment of a single purpose, and that purpose is manifestly the sole cause of the commission of the crime alleged...." State v. Zicarelli, 122 N.J. Super. 225, 241 (App.Div. 1973), certif. den. 63 N.J. 252 (1973), cert. den. 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973). The "other crimes" in that case were paying bribes to public officials for the "single purpose" of protecting the gambling enterprise that the defendant was charged with operating. However, where the "other crimes" were receiving bribes unrelated to an overall single purpose, we held that such evidence was not admissible to prove receipt of the bribe charged in the indictment. State v. Peltack, 172 N.J. Super. 287 (App.Div. 1980), certif. den. 84 N.J. 474, 475 (1980). The present case is indistinguishable. As the majority interprets the Rule, the State could routinely present evidence that a defendant committed crimes or bad acts on earlier occasions that were similar to the crime with which he is charged.
The majority also mislabels the evidence as proof of defendant's "intent" to strip search women in his control for an unlawful purpose. Defendant denied the strip searches, he did not claim that they were for a lawful purpose. Evidence may not be admitted under an exception in Rule 55 to rebut a defense that is not in issue. Peltack, 172 N.J. Super. at 292-293. See State v. Atkins, 78 N.J. 454, 462 (1979).
*626 Finally the majority would permit the evidence "to establish [defendant's] state of mind that he possessed the authority to lodge false criminal prosecutions thus enabling him to threaten his victims if they refused his advances." This effort to place the evidence within an exception to the Rule is merely a relabeling of the previous ones. In a related case we held inadmissible under Evid.R. 22 and Evid.R. 47 (barring use of character evidence to impeach credibility) evidence of prior wrongful conduct that was offered to impeach the credibility of a police officer who was the State's main witness in a criminal prosecution. State v. Mondrosch, 108 N.J. Super. 1, 4-5 (App. Div. 1969), certif. den. 55 N.J. 600 (1970). The evidence would have shown that the officer "had previously falsely accused certain persons of committing criminal acts." Id. at 4.
I sympathize with my colleagues' efforts to read into Rule 55 an exception that would admit relevant and probative evidence of a particularized predisposition to commit the offense charged. In my opinion, however, that objective requires either an amendment to the rule or a pronouncement by the Supreme Court.
I would reverse the conviction and order a new trial.
NOTES
[1] The indictment charges January 1, 1983 but the testimony established that it occurred in January, 1982. Defendant's brief also inaccurately reports it as having occurred on January 1, 1981.
[2] We are advised by the State that defendant was actually committed to State prison following imposition of sentence on September 13, 1984 and has since been released on parole as of September 16, 1986.