278 N.J. Super. 1 (1994)
650 A.2d 350
STATE OF NEW JERSEY, PLAINTIFF/RESPONDENT,
v.
JOHN F. HINDS, DEFENDANT/APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1994.
Decided December 2, 1994.
*4 Before Judges SHEBELL, SKILLMAN and WALLACE.
Jay L. Wilensky, Assistant Deputy Public Defender, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Mr. Wilensky, of counsel and on the brief).
Marcy H. Geraci, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Ms. Geraci, of counsel and on the brief).
The opinion of the court was delivered by WALLACE, J.A.D.
Defendant John Hinds was indicted with codefendant Michael Borsari for second degree conspiracy contrary to N.J.S.A. 2C:30-2a, 2C:20-3, 2C:20-7, and 2C:5-2; second degree official misconduct contrary to N.J.S.A. 2C:30-2, and 2C:2-6; third degree theft by unlawful taking contrary to N.J.S.A. 2C:20-3a, 2C:20-2, and *5 2C:2-6; and third degree theft by receiving stolen property contrary to N.J.S.A. 2C:20-7, 2C:20-2, and 2C:2-6. Following a jury trial defendant and Borsari[1] were found guilty on all counts. The trial court merged the conspiracy count into the official misconduct count and sentenced defendant to a seven year custodial term. The trial court also merged the third degree theft counts and imposed a concurrent four year custodial term. After the trial court denied defendant's motion for bail pending appeal, we granted bail pending appeal. This appeal followed.
Defendant raises the following contentions in his brief on appeal.
POINT I:
THE DEFENDANT'S CONVICTIONS OF OFFICIAL MISCONDUCT AS AN ACCOMPLICE AND OF CONSPIRACY ARE UNSUPPORTED BY THE FACTS AND PERTINENT LAW.
POINT II:
THE JURY INSTRUCTIONS AS TO OFFICIAL MISCONDUCT WERE MISLEADING AND HIGHLY PARTIAL TO THE STATE, NECESSITATING REVERSAL.
POINT III:
NUMEROUS AND EGREGIOUS INSTANCES OF MISCONDUCT BY THE PROSECUTOR AND TRIAL JUDGE VIOLATED DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL. U.S. CONST., AMEND. XIV; N.J. CONST. (1947), ART. 1, PAR. 10.
POINT IV:
THE TRIAL COURT'S FAILURE TO EXCUSE FOR CAUSE OR CONDUCT SUFFICIENT EXAMINATION ON VOIR DIRE OF NUMEROUS VENIRE PERSONS DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY. U.S. CONST., AMEND. VI, N.J. CONST. (1947), ART. 1, PAR. 10.
POINT V:
THE TRIAL COURT'S REFUSAL TO DOWNGRADE THIS MATTER FOR SENTENCING PURPOSES TO A THIRD-DEGREE OFFENSE RESULTED IN AN EXCESSIVE SENTENCE AND THUS AN ABUSE OF DISCRETION.
For the reasons that follow, we reverse.

*6 I
Defendant was employed as a security manager for a Caldor store in Holmdel, New Jersey. Borsari, a twenty-one year veteran of the Holmdel Police Department, was employed as a police sergeant in charge of the Department's detective bureau. Defendant and Borsari had known each other for over twenty years. They were often seen walking together through the Caldor store. In December 1990, the Caldor store manager, Thomas Keenan, began to suspect that defendant and Borsari were stealing merchandise. The incidents which led to an investigation and ultimately to defendant's arrest were described similarly by the witnesses on behalf of the State.
Pat Quaglia, the operations manager of Caldor, testified that shortly after she started to work at Caldor, defendant introduced her to Borsari. On one occasion she commented to Borsari that he was in the store often, and Borsari replied that he helped defendant catch shoplifters.
Debbie Eichler, a store employee, testified that on December 3 or 4, 1990, she saw Borsari pushing a shopping cart through the store which contained a blue Rubbermaid tote. While walking through the store, he placed various items of merchandise in the tote. Borsari exchanged glances with defendant and walked out the front entrance. The merchandise was neither bagged nor tagged. The following morning, Eichler told defendant that she had seen Borsari leave the store with unpaid merchandise. According to Eichler, defendant said "it can't be true ... [a]nd if it [is I will] punch Mike in the nose." However, defendant gave no indication that he would investigate the incident.
On December 7, 1990, Keenan saw Borsari in the store's record department. Borsari had a shopping cart which contained a blue Rubbermaid tote. Keenan observed Borsari hold up two videotapes and wave them at defendant. Borsari then left the store with unpaid merchandise with defendant behind him. Keenan decided not to stop Borsari and defendant as they exited the store. Keenan immediately contacted James Hanway, Caldor's regional *7 security manager, to inform him of the situation. Hanway, in turn, contacted Caldor's regional investigator, William Soop, and detectives William Hutnick and Dan Hurley of the New Jersey State Police Corruption Department. They decided to set up a surveillance of the Holmdel store.
Soop began his surveillance on December 13, 1990. He was given a physical description of the suspects, a copy of defendant's work schedule, and a camcorder. Soop arrived at the store at 6:37 p.m. As he walked through the store, he saw Borsari in the appliance department with a shopping cart containing several items. He then saw Borsari walk to the housewares department, grab a Rubbermaid tote, and place the merchandise that was in his cart inside the tote. From a security booth Soop then observed Borsari speak to defendant. Soop had left his camcorder in the car and did not videotape what he saw.
Soop then left the security booth and went to his car. From that vantage point, Soop observed Borsari exit the store without paying for the merchandise and place the merchandise in his car. Soop discontinued his surveillance and telephoned Hanway to report his observations. A video surveillance was planned for December 16, 1992.
On December 16, 1992, Soop arrived at the store at 7:45 a.m. He stationed himself in the store's security tower with a camcorder and a two-way radio. Hanway was stationed in the parking lot with detectives Hutnick and Hurley in order to observe the front entrance of the store.
According to Soop, defendant arrived at the store at 9:12 a.m. He saw defendant talking to his wife who was shopping. Borsari arrived at the store at approximately 10:50 a.m. with his two-year old grandson. After speaking with defendant, Borsari began walking through the store. Borsari took a Rubbermaid tote off the shelf and placed it in his shopping cart. As he walked through the store, Borsari placed merchandise inside the tote. Borsari then entered the store's vestibule area near the front entrance and *8 Soop lost sight of him. Soop radioed Hanway and the detectives and told them that Borsari was exiting the store.
Upon receiving Soop's communication, Hutnick moved his car to the front of the parking lot and waited for Borsari to exit the store. Borsari left his grandson with an acquaintance in the vestibule and walked with the merchandise to his car. As Borsari was putting the merchandise in his car, Hanway and Hutnick approached him and identified themselves as police officers. According to Hutnick, Borsari said that he was also a police officer and was working with defendant. Hutnick looked into the Rubbermaid container and told Borsari that he would be charged with shoplifting, and administered Miranda[2] warnings.
After Hutnick removed the stolen merchandise, Borsari was permitted to drive his grandson home. Detective Hutnick followed Borsari to his home where Hutnick again administered Miranda warnings. At that time, Borsari admitted stealing merchandise and agreed to return everything he had taken from the store. Borsari entered his home and emerged with the merchandise he had taken from Caldor on previous occasions. Hutnick returned to Caldor with the stolen merchandise he had recovered. The prices on the recovered merchandise totaled approximately $560.
Meanwhile, Detective Hurley identified himself to defendant and administered Miranda warnings. Defendant agreed to speak to Hurley and admitted seeing Borsari in the store that day. However, defendant told Hurley that he did not know whether or not Borsari had paid for the merchandise in his shopping cart.
Borsari testified at trial and admitted stealing merchandise from Caldor on December 13, 1990, December 16, 1990, and one other date; but maintained that he was never on police duty when he committed the thefts. Borsari testified that defendant was unaware that he was stealing merchandise from the store. Borsari *9 said that he did not plan to steal anything with defendant and all conversations he had with defendant related to Borsari's personal problems. Defendant did not testify at trial.
Based on this evidence, both Borsari and defendant were convicted of official misconduct, conspiracy, and theft.

II
The primary issue presented in this appeal is whether defendant may be convicted of official misconduct as an accomplice or co-conspirator for actions committed by Borsari, a police officer, while Borsari was not in the performance of his duties. Defendant contends that he should not have been convicted of official misconduct as an accomplice or co-conspirator or of conspiracy to commit official misconduct because Borsari did not violate N.J.S.A. 2C:30-2. Defendant further argues that even if Borsari could properly be convicted of official misconduct, defendant could not be held accountable for the same conduct as an accomplice or co-conspirator because N.J.S.A. 2C:30-2 was intended to apply to public servants only, and not private citizens.
We view the issue as one of statutory construction. In addressing statutory construction, we are mindful that we must begin our analysis by looking at the wording of the statute to ascertain its plain meaning. See Town of Morristown v. Woman's Club of Morristown, 124 N.J. 605, 610, 592 A.2d 216 (1991). Absent a legislative intent to the contrary, the language of the statute should be given its ordinary meaning. Ibid. See also Merin v. Maglaki, 126 N.J. 430, 434, 599 A.2d 1256 (1992). We are required to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." State v. Maguire, 84 N.J. 508, 514, 423 A.2d 294 (1980) (footnote omitted). Where the statute "is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than *10 [its] literal terms to divine the Legislature's intent." State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982).
N.J.S.A. 2C:30-2 provides in pertinent part:
A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or
b. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.
In explaining subsection b, the omission to act part of the official misconduct offense, the commentary to this section reveals that this subsection:
has reference to a public servant who consciously refrains from performing an official non-discretionary duty, which duty is imposed upon him by law or which is clearly inherent in the nature of his office. In addition, the public servant must know of the existence of such non-discretionary duty to act. Thus, such duty must be either one that is imposed by law, or one that is unmistakenly inherent in the nature of the public servant's office, i.e., the duty to act is so clear that the public servant is on notice as to the standards that he must meet. In other words, the failure to act must be more than a mere breach of good judgment. In the absence of a duty to act, there can be no conviction.
[2 Final Report of the New Jersey Criminal Law Revision Commission, The New Jersey Penal Code: Commentary § 2C:30-2, at 291 (1971) (emphasis added).]
We note also that at the time N.J.S.A. 2C:30-2 was amended by L. 1979, c. 178, § 61, eff. Sept. 1, 1979, a companion statute, N.J.S.A. 2C:30-1, was repealed. The repealed statute made official oppression a crime. In delineating the dichotomy between wrongful conduct involving the actor's official capacity, and conduct that is purely private wrongdoing by one who is a public servant, the Commentary stated:
So far as his private behavior is concerned, an official is subject to the same standards of behavior and penal controls as other persons; i.e., he may be punished for assault, extortion, or criminal trespass. It is only when he make[s] use of his official status to wrong another that the more comprehensive prohibitions of the legislation against oppression become appropriate.
[2 Final Report of the New Jersey Criminal Law Revision Commission. The New Jersey Penal Code: Commentary, supra, § 2C:30-1, at 290.]
*11 We believe this comment is equally applicable to N.J.S.A. 2C:30-2. The reason is that at the time N.J.S.A. 2C:30-2 was amended in 1979, and N.J.S.A. 2C:30-1 was repealed, the justification given for the repeal of N.J.S.A. 2C:30-1 was that the wrong to be reached under that section was adequately covered by N.J.S.A. 2C:30-2.[3]Senate Judiciary Committee Statement S. 3203 (1978). Thus, although the N.J.S.A. 2C:30-1 has been repealed, the comment concerning conduct by a public servant, in his private capacity, still has relevance under N.J.S.A. 2C:30-2.
With this background, we note that N.J.S.A. 2C:30-2 is captioned "Official misconduct" and sets forth when a "public servant is guilty of official misconduct." The plain language of the statute makes it clear that the statute applies to official misconduct of a public servant. We are satisfied that the statute is intended to reach criminal conduct by a public servant and does not extend to apply to purely private wrongdoing by one who happens to be a public servant.
We expressed the same view in Kauffman v. Borough of Glassboro, 181 N.J. Super. 273, 277, 437 A.2d 334 (App.Div. 1981), where we noted that the conviction for the common law offense of official misconduct by a police officer could not be based upon criminal behavior that was unrelated to the performance of a policeman's official duties. In Kauffman we stated:
Our analysis is not altered by the fact that the indictment also charged the common-law offense of official misconduct. That charge rested only upon the facts of the alleged burglary, and the most recent expression of our Supreme Court on this subject tells us that a conviction for misconduct cannot rest upon criminal behavior which is unrelated to the performance of official duties. State v. Schultz, *12 71 N.J. 590, 601 [367 A.2d 423] (1976). Contra, State v. Cohen, 32 N.J. 1, 10 [158 A.2d 497] (1960). But see, concurring opinion by Weintraub, C.J.
Had the indictment gone to trial, the only facts which plaintiff would have been called upon to meet were those pertaining to the burglary. In no way would his powers or position as a police officer have been implicated. To allow reimbursement in such a case merely because plaintiff was then employed as a police officer would advance no discernible policy underlying the statute and would require similar reimbursement in all such cases without limitation no matter how clearly the crime is unrelated to the fulfillment of police duties. Id., 181 N.J. Super. at 277-78, 437 A.2d 334.
The State contends that a police officer has an inherent duty to obey the law and is criminally responsible under a charge of misconduct in office when he fails to obey the law. In support of this argument, the State refers to the broad language in State v. Cohen, 32 N.J. 1, 10, 158 A.2d 497 (1960) where the Court stated that a police officer:
is criminally responsible under a charge of misconduct in office when either he himself commits, or he solicits others to commit ... crimes.... Such acts, carried to a conclusion, would be criminal per se, and we perceive a clear duty incumbent on a police officer not to act in such a manner.
[Ibid.]
Chief Justice Weintraub in his concurring opinion criticized the broad language of the majority opinion that could be read to state that "a policeman is guilty of the common-law crime by reason of his every infraction of the penal laws." Id. at 14, 158 A.2d 497.
In any event, we need not dwell on this argument because Cohen was decided in 1960 under the common law offense of official misconduct. The Legislature was aware of Cohen, when it adopted N.J.S.A. 2C:30-2 in 1978. Nevertheless, the legislative history makes no reference to Cohen except for the reference under the repealed N.J.S.A. 2C:30-1, and that reference is to the opinion in the Appellate Division which noted that misconduct in office was not meant to reach misconduct, criminal, or otherwise committed by a person who happened to be a public servant. State v. Cohen, 56 N.J. Super. 509, 513, 153 A.2d 688 (App.Div. 1959). See 2 Final Report of the New Jersey Criminal Law Revision Commission, The New Jersey Penal Code: Commentary, supra, § 2C:30-1, at 290. We are satisfied that the language *13 chosen by the Legislature is clear and unambiguous. It should not be read to include purely private conduct by a police officer.
Moreover, appellate counsel's research as well as our own has not revealed a reported case in this State in which a police officer was convicted of statutory official misconduct that was not in someway related to his or her official duties. The cases cited by the State involve a public servant's violation of a duty in his capacity as a public servant. See State v. Stevens, 203 N.J. Super. 59, 68, 495 A.2d 910 (Law Div. 1984), aff'd, 222 N.J. Super. 602, 537 A.2d 774 (App.Div. 1988), and aff'd, 115 N.J. 289, 558 A.2d 833 (1989) (Police officer accused of strip searching females he arrested). See also State v. Maiorana, 240 N.J. Super. 352, 573 A.2d 475 (App.Div. 1990), certif. denied, 127 N.J. 327, 604 A.2d 601 (1991) (Director of the Community Development Office accused of misconduct in office arising from her authorization of payment to codefendant before any services were received).
After careful review of the record, we are satisfied that the wrongful conduct of Borsari was purely in his private capacity. It is clear that Borsari was not acting in an official police capacity when he removed items of merchandise from the Caldor store. Borsari's alleged statement to Pat Quaglia, that he was in the store to "help [defendant] catch shoplifters," in response to her question about his presence there, does not raise his conduct to official capacity. He was simply a private person in the store who happened to be a police officer. Borsari was not employed by Caldor in any capacity, let alone to assist in security. Moreover, Borsari's statement that he was a police officer when approached outside of the store just prior to his arrest does not change our view. Borsari's acknowledgement that he was a police officer was a statement of his status. His comment does not alter the fact that his conduct on that occasion was in his private capacity and in no way related to his capacity as a police officer.
Under our view of the statute, Borsari's offense did not constitute official misconduct since he did not "refrain[] from performing a duty which is imposed upon him by law or is clearly *14 inherent in the nature of his office." N.J.S.A. 2C:30-2b. Borsari acted in his private capacity in removing the items of merchandise from the store without paying for them. It necessarily follows that since Borsari did not violate N.J.S.A. 2C:30-2, defendant can not be convicted as an accomplice or conspirator to commit official misconduct.

III
Because we conclude that defendant should not have been convicted as an accomplice or co-conspirator to commit official misconduct, we need not address defendant's argument that N.J.S.A. 2C:30-2b cannot extend accomplice liability to a private citizen. But see State v. Bryant, 257 N.J. Super. 63, 68, 607 A.2d 1343 (App.Div. 1992). Nor need we address defendant's argument in Point II that the jury instruction as to official misconduct was misleading and highly partial to the State. In this regard, however, we encourage trial judges to use the model jury charges to instruct on the law "in a manner that explains the law to the jury in the context of the material facts of the case." See State v. Concepcion, 111 N.J. 373, 379, 545 A.2d 119 (1988).

IV
We turn now to defendant's contention in Point III that the conduct of the prosecutor violated his right to a fair trial. In light of defendant's conviction on the two theft counts, it is still necessary to address this argument. In support of his argument that the conduct of the prosecutor deprived him of a fair trial, defendant refers to the following exchange during the State's cross-examination of defendant's wife, Alice Hinds:
DAG: Isn't it true that in the Fall of 1990, you [and] your daughters, stole merchandise 
DEFENSE COUNSEL: I object.
DAG:  out of that store 
DEFENSE COUNSEL: I object to that.
....

*15 THE COURT: Sustained.
DAG:  on many occasions?
A: No.
THE COURT: Sustained.
....
DEFENSE COUNSEL: I want to make a motion for a mistrial.
THE COURT: And I'm going to instruct the jury just to forget about the question. Forget about anything that was implied in that question.
The objection is sustained. Do not infer anything from what is in the question. I rule that it is inadmissible and I ask you to  ask you to disregard it completely. Go ahead.
....
DAG: Your Honor, I have 
DEFENSE COUNSEL: Judge, I don't want him to make a speech.
THE COURT: I don't care what you have. The objection is sustained. You will not go into it. It doesn't make any difference what you.... That's my ruling, whether you like it or not, Mr. Welle.
....
DAG: Did you ever move a cart loaded with merchandise out of that store while your husband stood in the vestibule 
DEFENSE COUNSEL: Judge, I object.
DAG:  and you didn't pay for it?
DEFENSE COUNSEL: I object to it again. He's accusing her of stealing and 
....
THE COURT: The objection is sustained.
....
DEFENSE COUNSEL: This is 
DAG: That  this is cross-examination.
THE COURT: I know what it is. I didn't think it was direct.
DAG: Does she have a motive in this case?
DEFENSE COUNSEL: I object to that comment.
THE COURT: Objection is sustained, and I will not allow you to go into it.
....
DAG: Let me ask you again. Did you ever, in the Fall of 1990 
DEFENSE COUNSEL: Judge 
DAG:  walk out of that store 
DEFENSE COUNSEL: He's going to 
THE COURT: Sustained. You're going to ask the question again.
DEFENSE COUNSEL: He's been instructed.
THE COURT: What did you do that for?

*16 DAG: I would like 
THE COURT: I'm not going to go to side bar. I have made a ruling. I am not going to listen to legal argument on it. I could anticipate exactly what you're going  your argument is going to be.
....
DAG: Your family rented a table on a number of occasions at the Collingswood Auction in the Fall of 1990 
DEFENSE COUNSEL: I'm going to object to this. It is has 
THE COURT: Sustained.
....
DAG: In your home, sometime before Christmas, did you have two Nintendos and just about every possible Nintendo game?
DEFENSE COUNSEL: This has nothing to do with the direct.
THE COURT: That objection is going to be overruled.
....
DAG: Let me slow it down. Ceiling fans, CD players, VCR, coffee makers, clothing, vacuum cleaners, et cetera, which were stolen from Caldors?
DEFENSE COUNSEL: I'm going to object.
THE WITNESS: No.
THE COURT: Sustained.... Next time it's going to be a sanction. Don't do it again.
DAG: I have no further questions.
Defendant also argues that the prosecutor engaged in unfair comment in summation when he made the following remarks:
DAG: You know, as a prosecutor and having worked for every [A]ttorney [G]eneral since Cahill.... I still cannot stop the boiling up in me[,] the anger and the blood pressure and the aggravation when, as a prosecutor, I sit there and I listen to [defense counsel] accuse police officers that are on the stand giving evidence of what happened on a particular day and by implicating me of doing something wrong and it's a good thing I didn't get up at 12:30 when I was really 
COUNSEL FOR BORSARI: Objection, Judge.
THE COURT: It's overruled.
COUNSEL FOR BORSARI: He's telling them what his personal opinion is.
THE COURT: No, it's not a personal opinion he's expressing. Go ahead.
DAG: What you have seen throughout this case as the evidence has been produced, as the examinations have [gone] on, as the defense counsel have sought in their own particular ways to pick on this, that and the other thing[,] is a way to approach a case which is so strong with respect to both Mr. Hinds circumstantially and directly and Mr. Borsari directly. What are we going to do? What are we going to do as defense counsel? You know the oldage [sic] the best defense is a good offense.... What did we hear from [defense counsel] about what people said *17 that they did and where they were during December of 1990? Nothing. Of course, we didn't because[]
The test to determine whether prosecutorial misconduct constitutes reversible error is whether the misconduct "was so egregious that it deprived defendant of a fair trial." State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987). Not every imperfection in the course of a prosecutor's summation will require a reversal of a conviction. State v. Smith, 27 N.J. 433, 460, 142 A.2d 890 (1958), cert. denied, 361 U.S. 861, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959). The misconduct must be viewed in the context of the entire trial to determine whether defendant was denied a fair trial. While a prosecutor has considerable leeway in presenting the case, State v. Williams, 113 N.J. 393, 447, 550 A.2d 1172 (1988), our Supreme Court noted in State v. Marshall, 123 N.J. 1, 586 A.2d 85 (1991), that:
The primary duty of a prosecutor is not to obtain convictions but to see that justice is done. Thus, "[i]t is as much his [or her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."
[Id. at 152-53, 586 A.2d 85 (citations omitted).]
Applying these principles, we are convinced that the questions of the prosecutor to Alice Hinds stating that she and her daughters stole merchandise were clearly objectionable and denied defendant a fair trial. After the trial court sustained defense counsel's objection to the initial question, he instructed the jury to disregard the question. Undaunted, the prosecutor continued to question Mrs. Hinds about taking merchandise without paying for it. After sustaining several objections to the initial question, the trial court permitted the prosecutor to ask if Mrs. Hinds had "just about every possible Nintendo game" in her home. It was only after the prosecutor expanded the question to include other items and added "which were stolen from Caldor[]," that the trial court sustained the objection and threatened the prosecutor with sanctions.
It was highly improper for the prosecutor to continue to ask Mrs. Hinds questions regarding stolen merchandise after the trial *18 court instructed the jury to disregard the question. She was not on trial. These questions were highly prejudicial to defendant who was on trial for theft. It is apparent that the prosecutor was attempting to plant in the jury's thoughts that Mrs. Hinds had stolen merchandise from Caldor, thus inferring that the defendant was involved with those and other thefts. We agree with defendant's contention that the "prejudicial impact of this utterly intentional course of conduct ... was so great as to have denied the defendant a fair trial."
Although the trial court threatened sanctions after the prosecutor continued to press his questions concerning theft by Mrs. Hinds, it did not give another instruction to the jury to disregard the prosecutor's subsequent improper questions. At that point, at a minimum, in addition to admonishing the prosecutor, the trial court should have given the jury a thorough and forceful instruction to disregard the questions.
Additionally, it was wrong for the prosecutor at the beginning of his summation to refer to his prosecutorial experience and affiliations, and then interject his personal opinion into the case. At least "[t]wo vices can be discerned in this sort of expression of personal opinion  first, the prosecutor's invitation to the jury to rely on him as a crime expert, and second, the implication that the prosecutor's judgment may be based on evidence not presented at trial." Albert W. Alschuler, Courtroom Misconduct by Prosecutors and Trial Judges, 50 Texas L.Rev. 629, 634 n. 22 (1972); accord, State v. Hipplewith, 33 N.J. 300, 311-12, 164 A.2d 481 (1960). The prosecutor's improper questions to Mrs. Hinds regarding stolen items in her home, coupled with the reference to his long standing position as a prosecutor, may well have conveyed to the jury that he was aware of bad acts outside of the evidence. See State v. Farrell, 61 N.J. 99, 103, 293 A.2d 176 (1972) (citing State v. Thornton, 38 N.J. 380, 398, 185 A.2d 9 (1962)).
*19 We are persuaded that the cumulative effect of the prosecutor's misconduct was highly prejudicial and deprived defendant of a fair trial.

V
We find no merit to the remaining issue raised in Point III regarding the trial judge's conduct. R. 2:11-3(e)(2). In view of our reversal, the issues raised in Points IV and V are moot.

VI
In summary, the judgment of conviction is reversed. The matter is remanded to the Law Division for dismissal of the official misconduct count and that portion of count I alleging conspiracy to commit official misconduct, and for a new trial on the remaining counts.
NOTES
[1] We are informed by the State that codefendant Michael Borsari did not appeal his conviction.
[2] Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706-07 (1966).
[3] N.J.S.A. 2C:30-1 entitled "Official Oppression" provided:

A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a crime of the third degree if, knowing that his conduct is illegal, he:
a. Subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or
b. Denies or impedes another in the exercise or enjoyment of any right, privilege, power or immunity.