253 N.J. Super. 375 (1992)
601 A.2d 1178
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SUNDIATA LUMUMBA A/K/A LOUIS HAGGOOD, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1992.
Decided January 28, 1992.
*377 Before Judges O'BRIEN, HAVEY and CONLEY.
Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Wilfredo Caraballo, Public Defender, attorney; Stephen W. Kirsch, of counsel and on the brief).
Steven V. McGettigan, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Steven V. McGettigan, of counsel and on the brief).
Sundiata Lumumba, appellant, filed a pro se supplemental brief.
The opinion of the court was delivered by CONLEY, J.S.C., temporarily assigned.
Following a jury trial defendant Sundiata Lumumba was convicted of four counts of kidnapping in violation of N.J.S.A. 2C:13-1b (Counts One to Four); knowing or purposeful murder *378 in violation of N.J.S.A. 2C:11-3a(1), (2) (Count Six) and felony murder in violation of N.J.S.A. 2C:11-3a(3) (Count Seven).[1] The State's motion for mandatory extended Graves Act terms was granted. Defendant was committed to the custody of the Commissioner of the Department of Corrections for four concurrent 30 year terms with 15 years parole ineligibility on the kidnapping Counts. On Counts Six and Seven, defendant was committed to the custody of the Commissioner of the Department of Corrections for two terms of life imprisonment with 30 years parole ineligibility, concurrent with each other but consecutive to the kidnapping sentences. In addition, a $150 Violent Crimes Compensation Board penalty was imposed.
The convictions arose from the killing of Darryl Workman on August 23, 1985. The State's case as to this killing was essentially presented through the testimony of co-defendant Samuel Wilkerson, who testified for the State as part of a plea bargain. Wilkerson, who acknowledged before the jury that he was a "lying murdering piece of s____" and that he would kill them to protect himself if necessary, testified that Workman was to be a witness in the murder trial of Wilkerson's friend Kenneth Parnell, and that he had tried to get him to change his testimony. Wilkerson also told the jury that Workman had snatched defendant's sister's pocketbook. He and defendant had decided to kill him.
On the evening of August 23, 1985, defendant rented a Camaro from the National Car Rental in Philadelphia. He and defendant drove to the S+D Lounge also in Philadelphia. Wilkerson went inside where Workman was, and asked to speak to him outside. They went outside and across the street to where defendant was waiting in the Camaro and got into the car. Wilkerson's and defendant's intention was to kill Workman. *379 According to Wilkerson, defendant called the planned killing, "taking care of business."
The three men drove a while and eventually stopped somewhere in New Jersey, when Wilkerson pulled a .38 "lemon squeezer" and shot Workman in the chest. Defendant then pulled Workman from the car and Wilkerson shot him again in the chest. Workman rolled over onto his stomach and Wilkerson shot him in the back. Meanwhile, defendant had reentered the car and kept saying `shoot him in the head'. After Wilkerson fired two more shots, they dragged the body over to some bushes where they threw it. Workman's body was discovered the next morning. It was undisputed the cause of his death was the shooting.
Wilkerson's grandfather testified that defendant had told him sometime during the summer he had bought a .38 caliber gun but needed some bullets. Defendant had asked him for bullets and obtained four or five .38 shorts. An expert determined that three bullets removed from the victim's body were .38 shorts. A search warrant executed at Wilkerson's house resulted in seizure of 23 live .38 caliber bullets. A search of defendant's house led to the seizure of a calendar with the following entries:
Aug. 23, 1985: I worked 8:30 a.m. to 3:30 p.m. (business day)
Aug. 25, 1985: (business day)
Oct. 10, 1985: Pop is down.
`Pop' or `Poppy' was Wilkerson's street name, and October 10, 1985 was the date of Wilkerson's arrest.
A National Car Rental employee identified defendant as the renter of a Camaro on August 23, 1985 and testified he had returned it the evening of August 25, 1985. It had gone 290 miles.
In addition to this evidence, the State sought to admit evidence of another crime committed that weekend. It was admitted pursuant to Rule 55 as evidence of a common plan. Wilkerson gave the State's primary account. After shooting Workman, *380 he said he and defendant planned to kill William Johnson, defendant's brother-in-law. Defendant wanted him killed because Johnson saw defendant beat his wife, who was Johnson's sister and because Johnson had told defendant's parole officer and had filed charges against him.
On August 25, 1985, Wilkerson and defendant drove back to New Jersey and parked the Camaro outside Johnson's house in Gloucester County. Eventually Johnson came out and got into a car accompanied by a "girl and a little boy." They drove off; defendant and Wilkerson followed them to a movie theater. Defendant and Wilkerson went into the theater, with the latter wearing a number of bandaids on his face  a disguise suggested by defendant. Defendant wore a broad-rimmed hat down over his face.
After the movie Wilkerson went to the Camaro and spoke with defendant. Wilkerson was reluctant to shoot Johnson because there were too many people around, and because there was the little boy in the car. After defendant insisted, Wilkerson walked up to Johnson's car and shot him three times in the head "to make sure he was dead," as instructed by defendant. Wilkerson returned to the Camaro, and the two drove from Gloucester County back to Philadelphia. An eye-witness to the Gloucester County shooting, who had been at the movies, identified both Wilkerson and defendant as well as the Camaro.
Johnson, who survived his injuries, testified and described the extent of them which included replacement of the top of his palate and part of his gum, 70 stitches on his face, 150 stitches inside his stomach, and removal of his spleen and four teeth.
He also testified to fights between defendant and his wife, Cheryl, who is Johnson's sister. Cheryl had called Johnson in June or July of 1985 to ask if she could stay with Johnson because defendant "was giving her a hard time." Defendant allegedly grabbed Cheryl and attempted to pull her away from Johnson. Later, according to Johnson, defendant saw him in Philadelphia, knocked Johnson to the ground and told him to *381 mind his own business or else risk being killed. This incident resulted in Johnson reporting the matter to defendant's Pennsylvania parole officer and filing a criminal complaint against the defendant.
Johnson also testified that Cheryl would often have bruises on her and that she and defendant did not have a loving relationship. Similar testimony regarding her bruises was presented by Howrhu Self, defendant's parole officer. Self also told the jury that defendant had violated his parole on several occasions.
Robin Rogers, Johnson's girlfriend, testified that defendant was abusing his wife and that defendant had punched Johnson and "threatened him with bodily harm." The State also presented Detective M. Scott Fitzpatrick who testified that as part of his investigation, he learned that defendant had previously been arrested for armed robbery in Lakehurst and that weapons were found in defendant's car at that time.
Defendant did not testify. However, James Bush testified that defendant and Cheryl were at his Philadelphia house, without a car, at 3:30 or 3:45 p.m. on Sunday August 25, 1985, the day of the Gloucester County shooting. Bush claimed that he had known defendant for 25 to 30 years and had never known him to be a "hit man". Moreover, Michael Woulfe testified that when he and Wilkerson were in the Gloucester County Jail, Wilkerson had told him that Wilkerson would have to frame defendant in order to get a good deal, and that he was planning on doing so.
Defendant's primary defense was alibi. In support of this, defendant's wife testified that defendant arrived home on the evening of August 23, 1985 at 6:30 p.m. He left the house briefly with a man named William Bruce and returned in time to attend a party at defendant's sister, Kathy Turner's house. Defendant and his wife did not have a car at the time, so they attended the party by way of public transportation. According to Cheryl, the party was held "for our son Dimples, Cynthia *382 [Carter] and Earl [Fowler]." They arrived at the party at 8:00 p.m. and did not leave until 7:30 a.m. the next day. Various pictures of them at the party were admitted into evidence. Elsie Clark, defendant's sister, testified similarly about the party, but could not remember the exact date on which it occurred.
On appeal, defendant raises the following points in the brief filed by counsel:
I. DEFENDANT DID NOT KNOWINGLY AND INTELLIGENTLY WAIVE HIS RIGHT TO COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT AND ARTICLE I, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION. (Not Raised Below).
II. THE TRIAL JUDGE'S VOIR DIRE OF THE PROSPECTIVE JURORS WAS SO PATENTLY INADEQUATE AS TO DENY DEFENDANT HIS SIXTH AMENDMENT RIGHT TO A TRIAL BY JURY, HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHTS AND HIS RIGHT TO A FAIR TRIAL UNDER ARTICLE I, PARAGRAPH 9 OF THE NEW JERSEY CONSTITUTION; ALSO, THE JUDGE'S PRETRIAL INSTRUCTIONS TO THE JURORS WERE INADEQUATE IN THAT THEY FAILED TO INFORM THE JURORS THAT AN INDICTMENT IS NOT EVIDENCE OF GUILT, AND THAT THERE IS A PRESUMPTION OF INNOCENCE AND A BURDEN OF PROOF UPON THE STATE BEYOND A REASONABLE DOUBT. (Partially Raised Below).
III. EVIDENCE RULE 55 WAS BLATANTLY VIOLATED WHEN THE TRIAL JUDGE ADMITTED EVIDENCE CONCERNING: AN ATTEMPTED MURDER ALLEGEDLY COMMITTED BY DEFENDANT AND SAMUEL WILKERSON TWO DAYS AFTER THE INSTANT CRIME, PHYSICAL BEATINGS ALLEGEDLY INFLICTED BY DEFENDANT UPON HIS WIFE, AN EARLIER ALLEGED ASSAULT UPON WILLIAM JOHNSON, DEFENDANT'S PAROLE VIOLATIONS AND DEFENDANT'S PRIOR ARREST FOR ARMED ROBBERY.
IV. THE TRIAL JUDGE VIOLATED DEFENDANT'S DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT AND HIS RIGHT TO A FAIR TRIAL UNDER ARTICLE I, PARA. 9 OF THE NEW JERSEY CONSTITUTION WHEN HE FAILED TO INFORM THE JURORS THAT COMPLICITY OR VICARIOUS COCONSPIRATOR LIABILITY WAS AN ELEMENT OF EACH OFFENSE THAT HAD TO BE PROVEN BEYOND A REASONABLE DOUBT FOR EACH CRIME IN ORDER TO CONVICT DEFENDANT OF THAT CRIME. (Not Raised Below).
V. THE PROSECUTOR'S SUMMATION VIOLATED DEFENDANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS AND RIGHT TO A FAIR TRIAL UNDER ARTICLE I, PARA. 9 OF THE NEW *383 JERSEY CONSTITUTION BY: ASKING THE JURY TO CONSIDER DEFENDANT'S RESIDENCE IN PHILADELPHIA AGAINST HIM, ASKING THE JURY TO MAKE INFERENCES AGAINST DEFENDANT BECAUSE OF HIS DEMEANOR WHEN DEFENDANT NEVER TESTIFIED, CRITICIZING DEFENDANT FOR NEVER VISITING HIS BROTHER-IN-LAW IN THE HOSPITAL, TELLING THE JURY ABOUT THE IMPROPER STATE V. IRVING INFERENCE, AND ATTACKING DEFENDANT'S CHARACTER BY DISCUSSING THE GLOUCESTER COUNTY CRIME, NEVER ONCE MENTIONING THE "PLAN" THAT THAT EVIDENCE WAS ADMITTED TO DEMONSTRATE. (Partially Raised Below).
VII. JUDGE KRAMER'S JURY CHARGE ON FELONY MURDER MISDEFINED THE ELEMENTS OF THAT CRIME AS INCLUDING EVEN ALL ACCIDENTAL KILLINGS, A CLEAR ERROR IN LIGHT OF STATE V. MARTIN. (Not Raised Below).
VIII. THE JUDGE'S JURY CHARGE ON AGGRAVATED MANSLAUGHTER SO MINIMIZED THE SERIOUSNESS OF THAT OFFENSE, IMPLYING THAT AN "ACCIDENTAL" KILLING WOULD BE AGGRAVATED MANSLAUGHTER, THAT DEFENDANT'S DUE PROCESS RIGHT TO A PROPER LESSER INCLUDED OFFENSE CHARGE WAS VIOLATED. (Not Raised Below).
IX. ALL OF THE KIDNAPPING CONVICTIONS SHOULD HAVE BEEN MERGED INTO ONE COUNT AND THE FELONY MURDER CONVICTION SHOULD HAVE BEEN MERGED INTO THE CONVICTION FOR KNOWING AND PURPOSEFUL MURDER. (Not Raised Below).
X. THE SENTENCES WHICH WERE IMPOSED SHOULD NOT BE RUN CONSECUTIVELY.
In his pro se supplemental brief, defendant also contends:
(1) DEFENDANT WAS DENIED A FAIR TRIAL UNDER THE "WATCHFUL EYE" OF GEORGE WASHINGTON, WHEN THE COURT REFUSED TO REMOVE A PORTRAIT OF THE ALLEGED "FATHER OF HIS COUNTRY" FROM THE WALL OF THE COURTROOM, IN VIOLATION OF DEFENDANT'S RIGHTS UNDER THE FIRST, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.
(2) DEFENDANT WAS DENIED HIS RIGHTS UNDER THE FOURTEENTH AMENDMENT WHEN HE WAS CONVICTED AGAINST THE WEIGHT OF THE STATE'S CASE.
(3) THE ASSISTANT PROSECUTOR USED HIS PEREMPTORY CHALLENGES TO TARGET/REMOVE AFRICAN AMERICANS FROM THE JURY, WITHOUT OFFERING A REASON, AND IN VIOLATION OF DEFENDANT'S RIGHT TO A FAIR TRIAL.
(4) DEFENDANT WAS DENIED HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN *384 THE COURT SUBSTANTIALLY IMPAIRED THE CROSS-EXAMINATION OF STATE'S CHIEF INVESTIGATOR DURING TRIAL.
(5) DEFENDANT WAS DENIED HIS RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.
(6) DEFENDANT WAS DENIED HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WHEN THE COURT DENIED DEFENDANT'S MOTION TO CALL THE ASSISTANT PROSECUTOR AS A DEFENSE WITNESS.
(7) DEFENDANT WAS DENIED HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION WHEN THE COURT PASSED SENTENCE WITHOUT FIRST OBTAINING THE REQUIRED AND LAWFUL PRESENTENCE REPORT.
We have carefully considered these claims in light of the transcripts, briefs, arguments of counsel and applicable law. We are convinced all of the points raised in the pro se brief and points IV, VI, VII and VIII are clearly without merit. R. 2:11-3(e)(2). However, we think points II, III and V raise substantial issues that require reversal. We further conclude that point I raises a significant issue but which, given our remand, we leave for reconsideration by the trial court. The remaining points, IX and X, concern the sentences and are moot given our decision to reverse.

I.
The trial in this case lasted 10 days. At least three quarters of the evidence related to the August 25, 1985 Gloucester County shooting of William Johnson.[2] Defendant contends that this other crimes evidence was improperly admitted and unduly prejudiced him.
The admissibility of other crimes is governed by Evid.R. 55 which provides:
Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil *385 wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
The "rule prohibits the admissibility of other crimes simply to show that the defendant had a propensity to act in a certain way." State v. Stevens, 222 N.J. Super. 602, 614, 537 A.2d 774 (App.Div.), certif. denied, 111 N.J. 575, 546 A.2d 503 (1988), aff'd, 115 N.J. 289, 558 A.2d 833 (1989). See State v. Kociolek, 23 N.J. 400, 419, 129 A.2d 417 (1957). "Its purpose is to protect defendants from the potentially great prejudice inherent in `other like crimes' evidence, since the average jury will much more readily accept the belief that one is guilty of the crime charged where it is demonstrated that he has committed a similar crime." State v. Peltack, 172 N.J. Super. 287, 292, 411 A.2d 1156 (App.Div.), certif. denied, 84 N.J. 474, 420 A.2d 1298 and 84 N.J. 475, 420 A.2d 1298 (1980). As our Supreme Court noted in State v. Moore,
... [t]he danger that Evidence Rules 55 and 47 seek to prevent is that a defendant will be prejudiced by evidence of other acts such that a jury will convict because he or she is a bad person disposed to commit crime. State v. Garfole, 76 N.J. 445, 450-51 [388 A.2d 587] (1978).
[113 N.J. 239, 275, 550 A.2d 117 (1988)].
See State v. Ramseur, 106 N.J. 123, 265, 524 A.2d 188 (1987); Stevens, 222 N.J. Super. at 614-15, 537 A.2d 774. Thus, when a defendant is on trial charged with a particular crime, evidence that he committed other crimes even of a similar nature is generally inadmissible unless:
... the evidence of other crimes is part of the res gestae, or tends to prove some element of the crime for which he is on trial, or where the evidence of another crime tends to show malice, ill-will or intent on the part of defendant, or where a common scheme or plan embodies the commission of two or more crimes so related that proof of one tends to establish the other. State v. Kociolek, 23 N.J. 400, 418-419 [129 A.2d 417] (1957). Also, where the commission of another crime evinces a state of mind that is shown to exist at the time of the commission of the crime charged, and is so related to the crime charged as to time, place and circumstances that the state of mind may be said to be continuous, evidence of the other crime may be admissible. State v. Sinnott, 24 N.J. 408, 413-414 [132 A.2d 298] (1957).
[State v. Smith, 84 N.J. Super. 452, 459-60, 202 A.2d 461 (App.Div.), certif. denied, 43 N.J. 270, 203 A.2d 720 (1964) (emphasis added)].
*386 In denying defendant's motion to preclude the use of the Gloucester County attempted murder evidence, the trial judge found evidence of a plan to kill two unrelated people. In this respect, he said:
[I]f ever there was a plan  and whether or not this amounts to a plan is going to be an issue for the jury  it was here.
If I understand the Prosecutor correctly, the State's position is they go to the girl's room or apartment, wherever he lived. There's a diary mapping out what was going to happen over the weekend. With Friday being marked as a business day when the first murder took place in Burlington County, and Sunday marked down as the next business day where the Gloucester County shooting took place.
What do we have as further evidence of the plan? Lumumba rents a car Friday afternoon. Lumumba turns the car back into the car agency  he rents the car in Philadelphia. He turns the car back into the car rental agency in New Jersey Sunday afternoon subsequent to the shooting. Further evidence of a plan, Lumumba is on parole. If he's seen or involved in any way in a shooting he's also had it. Back he goes. So what other reason, what better reason could he have for getting a gunman while he drives the car and stays back in the shadows out of sight. Which is allegedly what happened in Gloucester County. Of course, with the shooting in Burlington County here, everybody is out of sight. It's in the middle of the night down in the pines.
Further evidence of a plan or a plot  not of the plan itself, but motive. The second business day Lumumba wants his brother-in-law, according to the State's theory, dispatched because of the brother-in-law has run over to Philadelphia and squealed on Lumumba to Lumumba's parole officer.
To be sure, there were common threads to both crimes under the State's theory: defendant used the rented Camaro for both crimes, had Wilkerson do the shooting in both, used the same gun and marked each day in his calendar as "business day." These common threads, the State contends, demonstrate a common plan to kill two people defendant did not like and thus was properly admissible under Rule 55. Defendant contends that under the circumstances here, this extends the "common plan" exception in Evid.R. 55 too far. We agree.
Evidence of other crimes is admissible to demonstrate a common plan where "the several crimes may have sprung from a single motive, aiming at the accomplishment of the same end." State v. Zicarelli, 122 N.J. Super. 225, 240, 300 A.2d 154 (App.Div.), certif. denied, 63 N.J. 252, 306 A.2d 455 cert. *387 denied, 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973). More than strong factual similarity between the other crimes and the indicted offense is required. As the Supreme Court recently noted:
... [T]he "plan" example refers to instances in which the other-crime evidence proves the existence of an integrated plan, of which the other crimes and the indicted offense are components. As we observed in State v. Louf, 64 N.J. 172, 178 [313 A.2d 793] (1973): "[W]here such [other crime] evidence tends to establish the existence of a larger continuing plan of which the crime on trial is a part, it is admissible for such purpose" ...
[State v. Stevens, 115 N.J. at 305-06, 558 A.2d 833].
Thus such evidence is admissible where a common scheme or plan embodies the commission of two or more crimes so related that proof of one tends to establish the other. State v. Kociolek, 23 N.J. at 418-19, 129 A.2d 417.
For example, in Louf other crimes evidence of a bribery was permitted to show "a large conspiracy to maintain gambling in Hudson County" of which the charged bribery offense was a part. In Zicarelli, defendant was charged with conspiracy to corrupt officials in order to protect his illegal gambling operation. Other evidence of corruption of officials was admitted as part of the overall conspiracy demonstrating the general purpose to protect defendant's gambling operation. The court observed in this respect:
... it has been held that where a series of crimes is committed for the accomplishment of a single purpose, and that purpose is manifestly the sole cause of the commission of the crime alleged, proof of the separate crimes is competent evidence. State v. Fay, 127 N.J.L. 77, 83 [21 A.2d 607] (Sup.Ct. 1941). In Fay it was said:
Where a series of crimes are committed for the accomplishment of a single ultimate purpose, and that purpose is manifestly the sole inducing cause of the commission of each separate crime, the rule applied in the case just cited makes proof of these separate crimes competent evidence ... (citation omitted).
[State v. Zicarelli, 122 N.J. Super. at 241, 300 A.2d 154].
On the other hand, in Stevens, evidence of incidents in which defendant police officer had previously used his official position to intimidate women into disrobing or providing sexual favors in a trial on similar charges was held inadmissible under the *388 common plan exception in Evid.R. 55. Although the State argued the evidence demonstrated a common plan, design or scheme, in which defendant "used his position as a police officer to intimidate helpless females if they did not submit to degrading sexual acts to satisfy ... his prurient interests ...", the Supreme Court found no integrated plan or scheme. State v. Stevens, 115 N.J. at 305-06, 558 A.2d 833.
The alleged common plan or scheme that the State here claims is sufficient to permit the wholesale incorporation of the Gloucester County attempted murder evidence, is defendant's plan to kill two people he did not like. This is no different from the alleged plan or scheme in Stevens found insufficient to support the admission of other similar crimes. And, although the same car, the same gunman and the same weapon may have been used, we have difficulty discerning any common or higher goal to which the killings were related. Workman and Johnson, for instance, were not both involved in the alleged purse snatching of defendant's sister or, conversely, in the trial against Wilkerson's friend Kenneth Parnell. Further, although the State focuses upon Wilkerson's testimony that defendant wanted to kill Workman because of purse snatching of his sister, there was evidence from which the jury could infer that his own reason for the killing was, at least in part, to silence Workman who was to give damaging testimony against his friend. Wilkerson's shooting of Johnson, thus, was totally unrelated to Workman's killing.
We recognize some cases concerning joinder of offenses pursuant to R. 3:7-6 seem to more broadly construe Evid.R. 55. See State v. Long, 119 N.J. 439, 473-74, 575 A.2d 435 (1990) (joinder of murder and a separate assault crime held proper where the same gun was used and the court noted evidence of the separate crimes would be admissible under Evid.R. 55 to establish the weapon used); State v. Moore, 113 N.J. 239, 272-75, 550 A.2d 117 (1988) (joinder of 33 counts stemming from abuses of minors was upheld, the court noting that evidence of *389 all of the crimes would have been admissible under Evid.R. 55 to show the circumstances surrounding the most serious indicted offense (murder), and to show that the death was the result of a plan orchestrated and controlled by the defendant); State v. Hardison, 204 N.J. Super. 1, 10, 497 A.2d 868 (App.Div. 1983) aff'd, 99 N.J. 379, 492 A.2d 1009 (1985) (joinder of two separate robberies on the same night was upheld because "the record include[d] evidence of a `common scheme or plan' rather than separate and unrelated events"); State v. Coruzzi, 189 N.J. Super. 273, 297-99, 460 A.2d 120 (App.Div.) certif. denied 94 N.J. 531, 468 A.2d 185 (1983) (joinder of three incidents of bribery permitted where defendant had conversations with another person implicated in the briberies concerning two of the incidents and, thus, "a common thread" was found to bind the incidents together).
The State argues that, similarly, here there are numerous threads connecting the Burlington County murder of Darryll Workman with the Gloucester County shooting of William Johnson. We have previously noted this is so. And, were the issue one of proper joinder pursuant to R. 3:7-6 these common threads might be sufficient.
But we note, however, that R. 3:7-6 does not require as a precondition for permissible joinder that evidence of one prove some fact or facts at issue in the other. Unlike R. 3:7-6, Evid.R. 55 requires such precondition. State v. Stevens, 115 N.J. at 301, 558 A.2d 833. And, as the Supreme Court observed in Stevens:
A necessary corollary to the principle that other-crime evidence can be admitted to prove any fact in issue  whether or not included among the specific examples set forth in Rule 55  is the requirement that the "issue" be genuine, and that the other-crime evidence be necessary for its proof. As one commentator explains:
"Probative worth," however, consists of more than logical relevance or persuasiveness. No matter how persuasive of the fact it is supposed to prove, other crimes evidence has no probative worth if the fact is not in issue. Perhaps the clearest case would be other crimes evidence offered to prove a fact not material to proof of the charged crime  for example, specific intent in a manslaughter trial. Because such evidence does not advance the search *390 for truth, it serves no purpose which might justify whatever prejudice it creates, and is excluded for that reason. A similar situation would exist when the accused concedes the issue to be proved  for example, when he admits committing the act is question and bases his defense on some other grounds. Courts have applied this principle to forbid the introduction of evidence on issues which seem impossible to dispute, and which are in fact not contested.
Further, even if other crimes evidence is determined to be material to a fact genuinely in issue, "the probative value of proffered evidence should be carefully balanced against the danger that it will create undue prejudice against the defendant." Stevens at 302, 558 A.2d 833. See also State v. Ramseur, 106 N.J. 123, 265, 524 A.2d 188 (1987); Evid.R. 4.
Here, unlike the evidence of other corruption crimes in Zicarelli, for instance, that was probative of the overall conspiracy involved in the indicted offenses, defendant's alleged plan to snuff out the lives of two he did not like during the same weekend was probative of nothing in the Workman trial. Although ostensibly it might be suggested it establishes a motive, motive was never a genuine issue in dispute during the trial and was otherwise established through Wilkerson's testimony concerning his reasons for killing Workman.
And, while evidence tending to show defendant's use of the Camaro, continuing involvement with Wilkerson and the gun on August 25, 1985 would be material and probative of issues concerning the August 23, 1985 killing, those facts were already established through other evidence. See State v. Stevens, 115 N.J. at 303, 558 A.2d 833. Note, Other Crimes Evidence at Trial: Of Balancing and Other Matters, 70 Yale L.J. 763, 772 (1961). For example, the car rental agency employee identified defendant as renting the Camaro on August 23, 1985 and returning it late August 25 as well as testifying as to substantial mileage put on the vehicle. Wilkerson's father-in-law provided testimony tying defendant to .38 shorts and a gun. Moreover, the evidence placing defendant and Wilkerson together and connecting them with the Camaro on August 25 could readily have been admitted without the *391 wholesale proof of the attempted murder. But the specifics of the actual shooting, the evidence of the extensive injuries to Johnson, the evidence of wife-beating, parole violations, prior assaults and of the Lakehurst armed robbery which virtually pervaded the trial, had no relevancy to the Workman crime. The substantial capacity to prejudice defendant is, further, apparent.
In sum, we agree with defendant that evidence of the Gloucester County crime is not admissible under Evid.R. 55 as evidence of a common plan and that even if there were a "common plan", it is not probative of any genuine issues of fact in the Workman crime that could not otherwise be proven. But beyond this, we are firmly convinced if that evidence had any probative value in the Workman trial, the capacity for prejudice far outweighs that value. We thus conclude it was improperly admitted.

II.
Defendant contends the jury voir dire did not result in an impartial jury because the trial court asked only three questions of the jury and did not probe them as to their understanding of basic principles applicable to criminal trials and their ability to abide thereby. We agree.
Jury voir dire is conducted by the trial court, R. 1:8-3(a), to avoid unnecessarily protracted voir dire. State v. Manley, 54 N.J. 259, 281, 255 A.2d 193 (1969). Generally, a trial court's decisions regarding jury voir dire are entitled to deference from a reviewing court. State v. Hunt, 115 N.J. 330, 348, 558 A.2d 1259, reconsid. denied, 117 N.J. 152, 564 A.2d 873 (1989); State v. Williams (II), 113 N.J. 393, 410, 550 A.2d 1172 (1988).
However, an impartial jury is a necessary condition to a fair trial and a voir dire designed to expose potential bias is essential. State v. Hunt, 115 N.J. at 348, 558 A.2d 1259; State v. Williams (II), 113 N.J. at 409-10, 550 A.2d 1172. The right of a defendant to an impartial jury is of exceptional significance *392 and the triers of fact must be as nearly impartial "as the lot of humanity will admit". State v. Williams (I), 93 N.J. 39, 60, 459 A.2d 641 (1983). The voir dire is an "important, indeed critical, means for dealing with potential and latent bias...." Id. at 68, 459 A.2d 641. In conducting jury voir dire, the court "should be particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias." Id.
Involving almost the same type of questions asked here, we recently reversed a conviction because the jury voir dire was inadequate. State v. Oates, 246 N.J. Super. 261, 587 A.2d 298 (App.Div. 1991). In Oates, the court addressed three general questions to the entire panel concerning: 1) previous participation in a criminal jury trial as a juror or witness, 2) relatives or friends who had been the victims of crime, and 3) relatives or friends engaged in law enforcement. Id. at 265-66, 587 A.2d 298. The case involved distribution of cocaine, and defendant requested a question whether prospective jurors' relatives or friends ever had a drug problem. Id. at 266, 587 A.2d 298. The trial judge asked only if there was "any reason personal to you with respect to this type of case why you could not do a good job as a juror ..." Id. at 267, 587 A.2d 298. Further, the judge refused to question jurors regarding favorable bias they might have with regard to the testimony of police officers. Id. at 267, 587 A.2d 298.
In reversing, we found the question regarding drug problems was "too narrow", and the jury should have been asked about bias regarding the testimony of police officers since the State's only witnesses were police officers. Id. at 267, 587 A.2d 298. We also observed the failure to examine prospective jurors in certain "essential" areas. These include failing to explain that the indictment was not evidence, but merely a vehicle for bringing the defendant to trial, failing to inquire whether relatives or friends had ever been accused of a violation of law other than traffic violations, failure to ask about previous service on a grand jury or civil trial jury, and failure to explain *393 that, although the jurors are the triers of fact they must apply the law as directed by the judge. Id. at 268, 587 A.2d 298. In this respect, we said:

R. 1:8-3(a) is a rule of efficiency, not of dilution. It was designed to expedite, not minimize the essential purpose of obtaining a fair and impartial jury. A thorough voir dire, as necessary as is required for the particular matter on trial, must be conducted in every case ... The limited jury questioning in this case commends itself only for its brevity. It assisted the State and the defendant very little in the quest to assure impartiality and to unearth predisposition, bias or outright hostility. Defendant was deprived of his constitutional right to a fair trial ...
[Id. at 269, 587 A.2d 298].
Here the trial judge asked the following three questions:
All right. First of all, ladies and gentlemen, have any of you ever previously participated in a criminal jury trial? Either as a juror or as a witness?
* * * * * * * *
Do any of you have anyone close to you either as a friend, a social friend or a relative close to you  not a distant relative  whose [sic] ever been the victim of a crime of violence? Murdered, assaulted, raped. Personal victim of a crime of violence.
* * * * * * * *
All right. Thank you. Finally, a third general question. Do any of you have, close to you, either a friend or a relative whose [sic] engaged in police work? Either a policeman, a trooper, a marshall, a deputy, a warden, a jail guard.
In addition, each juror was asked his or her place of residence, occupation, marital status, and the occupation of his or her spouse. However, the judge refused to explain to the jury the grand jury process, the fact that an indictment is not evidence of guilt, and that defendant was presumed innocent. More importantly, he did not determine whether all jurors could abide by those principles. Thus he refused defense counsel's request, "... to advise these particular jurors, as with every juror who is potentially seated, whether or not they have any problem accepting at this juncture, without having heard anything concerning the case, that Mr. Lumumba is indeed presumed innocent. And can they accept that presumption during this  listening to the trial."
As the State notes, there is no particular litany required for the jury voir dire. In State v. Moore, 122 N.J. 420, 585 A.2d *394 864 (1991) the court considered various potential methods of probing for juror understanding regarding the presumption of innocence and ability to apply that presumption. An earlier case, State v. Manley, 54 N.J. 259, 255 A.2d 193 (1969) had stated, "As suggested hereafter, however, we believe use of hypothetical questions on subjects usually covered in a court's charge should be supervised carefully and rarely allowed." Id. at 270, 255 A.2d 193. As to certain basic criminal principles, however, Moore said:
"The mere fact some inquiry on voir dire may touch on instructions later to be given does not per se render such questions beyond the scope of voir dire." [Citation omitted] We are confident that court and counsel can focus any such inquiry on this limited purpose without causing trial delay.
[Moore, 122 N.J. at 456, 585 A.2d 864].
We agree the trial judge was not obliged to ask any particular question or indulge the defendant's requests absolutely. However, he was required to facilitate selection of an impartial jury through a voir dire designed to expose potential juror bias. State v. Williams (II), 113 N.J. at 409-10, 550 A.2d 1172 (1988). In a case such as this, where evidence of prior convictions might emerge through character witnesses (see Evid.R. 47; State v. Pennington, 119 N.J. 547, 549, 575 A.2d 816 (1990)), where under Evid.R. 55 the State sought to bring in evidence of another serious crime in which defendant was implicated, and where the penalties to which defendant was exposed were very severe, we agree with Oates that more than what was done here is required. At the least, the jury must be asked whether they understand the basic principles of presumption of innocence and those governing the indictment and whether they can abide by these principles. Failure to do so deprived defendant of his constitutional right to a fair trial. State v. Hunt, 115 N.J. at 348, 558 A.2d 1259; State v. Oates, 246 N.J. Super. at 269, 587 A.2d 298.

III.
Defendant presented an alibi defense through the testimony of his wife and sister regarding a party in Philadelphia the *395 night Workman was murdered. The party was in honor of a cousin, Cynthia Carter and was also for Earl Fowler's birthday. Earlier, alibi notices had been provided to the State indicating Earl Fowler would be called as a witness. An alibi notice which had been prepared for the earlier Gloucester County trial was also supplied to the Burlington County prosecutor's office prior to trial, apparently to be used for purposes of this later trial. That notice indicated the host of the party, defendant's sister, Kathy Turner, would be called. Neither of these individuals testified. Prior to summations, the State notified the court that it wished to draw an adverse inference from the failure to call Earl Fowler and Kathy Turner as well as to refer to the alibi notice. The State was permitted to do so and the trial court gave an adverse inference charge. Defendant now contends this was erroneous.
This contention raises two issues: 1) whether under State v. Clawans, 38 N.J. 162, 183 A.2d 77 (1962) prosecutorial comment on the absence of the two witnesses was proper without any reference to the alibi notice; 2) whether advising the jury of the alibi notice and defendant's evident intent to call those witnesses was proper. We think a Clawans adverse inference was appropriate, but reference to the alibi notice was not.
Under Clawans, a party's failure to produce a witness who would "serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." Id. at 170, 183 A.2d 77. However, for the inference to be drawn, certain conditions must be met. "[I]t must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved." Id. at 171, 183 A.2d 77. The inference is not proper where the witness is unavailable, or strongly biased against the party, or where the testimony would be "cumulative, unimportant, or inferior." Id.
*396 All of the above conditions were met in the present case. The question of a party on August 23, 1985 was in dispute. Both missing witnesses were relatives of the defendant (cousin and sister), residents of Pennsylvania, and listed as someone defendant planned to call. Thus, it would appear the witnesses were, indeed, within defendant's power to produce, and probably not within the State's power to produce. Finally, the only witness who stated the date of the party was defendant's wife. The testimony of an honoree or the hostess of the party, however, would not have been cumulative or inferior.
An adverse inference under Clawans focuses upon the potential witness and an inference of unfavorable testimony he or she might provide. On the other hand, an inference drawn from failure to call a witness listed on a notice of alibi focuses upon the truthfulness or credibility of defendant. Comment, thus, upon the notice during trial is a separate issue.
R. 3:11-1 requires that defendant provide a written alibi notice. "That requirement is for discovery purposes only, `to avoid surprise at trial by the sudden introduction of a factual claim which cannot be investigated unless the trial is recessed to that end.' ... The rule `is not designed to compel a defendant to say anything' ..." State v. Gross, 216 N.J. Super. 92, 95, 523 A.2d 212 (App.Div.), certif. denied, 108 N.J. 194, 528 A.2d 19 (1987). Thus, a requirement that such a notice be provided by defendant prior to trial does not violate a defendant's right against self-incrimination. State v. Irving, 114 N.J. 427, 435, 555 A.2d 575 (1989). And, when a defendant chooses to testify and his testimony is inconsistent with information in the alibi notice, the notice may be used to impeach his credibility. Id. at 439, 555 A.2d 575 (trial inconsistency between defendant's trial testimony, in which an individual was admitted to be the key to the alibi defense, yet the contents of the alibi notice failed to include his name).
Unlike Irving, defendant did not testify. We have previously held that where a defendant does not testify, reference cannot *397 be made to an alibi notice and failure to call a witness thereon to imply the defendant had made an untruthful claim. State v. Gross, 216 N.J. Super. at 96, 523 A.2d 212. See State v. Irving, 114 N.J. at 439, 555 A.2d 575. This is so even when under Clawans, the jury may be asked to draw from the failure to call a particular witness an inference that that witness would provide unfavorable testimony. It is far more damaging to suggest a defendant is not credible because of the contents of the alibi notice. We agree it is improper to do so when the defendant has chosen not to testify.

IV.
Although each of these errors might not separately warrant reversal, we are convinced a cummulation of them denied defendant a fair trial. State v. Orecchio, 16 N.J. 125, 106 A.2d 541 (1954). Consequently the conviction and sentences will be vacated and the matter remanded for further proceedings. We do not retain jurisdiction.
NOTES
[1] Count Five charged defendant with purposeful or knowing murder in violation of N.J.S.A. 2C:11-3a(1) and (2). It was dismissed on the State's motion prior to trial.
[2] During a separate trial, defendant was convicted of the attempted murder of William Johnson. We recently affirmed that conviction in State v. Haggood, Docket # A-5811-87T4.