PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1780
_____

GERALD HOWELL,
Appellant

v.

SUPERINTENDENT ALBION SCI; ATTORNEY
GENERAL PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-05-cv-02843)
District Judge:  Hon. Juan R. Sanchez
_____

Argued
June 17, 2020

Before:   JORDAN, MATEY, and ROTH, *Circuit Judges.*

(Filed:  October 21, 2020)
_____

Sean E. Andrussier
Farrah Bara
Ethel Hylton
Mark Rothrock
Spencer Scheidt   [ARGUED]
Duke University School of Law
210 Science Drive
Box 90360
Durham, NC  27708
    *Counsel for Appellant*

Max C. Kaufman
David Napiorski   [ARGUED]
Philadelphia County Office of District Attorney
13th Floor
3 South Penn Square
Philadelphia, PA   19107
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Herbert Allen was shot and killed on Christmas Eve, 1982.  Although next to no physical evidence was recovered from the crime scene, Gerald Howell was arrested for the murder.  His arrest and later conviction at trial were based on witness testimony.  Fast forward to today, however, and three of the prosecution's witnesses from the trial have recanted their testimony.  A fourth died long ago because he was prepared to testify against another witness the

2

Commonwealth relied on, Kenneth Parnell, who appeared at Howell's preliminary hearing but later confessed to Allen's murder himself. Based on the recantations and Parnell's confession, Howell now asserts a claim of actual innocence and seeks to set aside the District Court's dismissal of his untimely habeas petition.

The District Court ruled that the recantations were categorically unreliable and thus not an appropriate basis for habeas relief. That was error. Although recantations are generally looked upon with suspicion, they are not subject to a categorical rejection, and, indeed, the recantations in this case cast significant doubt on Howell's conviction, particularly when considered together with Parnell's confession. Although the hurdle for actual-innocence relief on an otherwise time-barred habeas claim is very high, it is possible that Howell can clear it. We will accordingly vacate the order denying his motion under Federal Rule of Civil Procedure 60(b)(6) to set aside the earlier dismissal of his habeas petition and will remand to the District Court for an evidentiary hearing on his new evidence, so that a more complete record can be developed upon which to decide the Rule 60(b)(6) motion.

## I.     BACKGROUND

On the evening of December 24, 1982, police officers responded to a report of a shooting in the vicinity of 11th and Huntingdon Streets in Philadelphia and found Herbert Allen lying face down in his blood between two cars. He was taken to a hospital and pronounced dead shortly thereafter. Except for the blood stain, the police found no physical evidence at the scene.

A few weeks later, Gerald Howell was arrested for the murder. At a preliminary hearing, the Commonwealth presented the testimony of Kenneth Parnell, an acquaintance of Howell's. Parnell testified that on the night of the murder, he was walking with a friend when they happened to meet Howell. The three of them walked on together and, at some point, saw Allen. Parnell said that Howell went over to Allen and started "scuffling" with him. (App. at 389.) According to Parnell, Howell then pulled out a gun, shot Allen in the chest, and took his watch and wallet. Based on that testimony, the court was satisfied that there was enough evidence to send the case to trial.

When the time for trial arrived, however, Parnell did not testify. Instead, the prosecution's main witnesses were Karla Hearst, Darryl Workman, and Arlene Williams. Two additional witnesses – Cheryl Jones and Warren Wright – were called in rebuttal.

Hearst testified that on the evening of the murder, she was outside her house with her cousin and Jones when she heard a gunshot. She ran to the corner of Huntingdon and Sartain streets and saw a man with a gun in his hand running west on Huntingdon. She said she recognized him as Howell and noted that he was wearing a beige jacket. After she went and looked at Allen's body, she went to Allen's father's house to report the shooting.

Darryl Workman testified that on the night of the shooting he was smoking marijuana with Parnell and Howell in the vicinity of the crime scene. According to Workman, they started walking, and Howell, who had caught sight of

4

Allen, said "I'm going to get him." (App. at 227.) Parnell and Workman kept walking while Howell confronted Allen and shot him. Workman said that, after the shooting, Howell "went in [Allen's] pockets and ran up Huntingdon Street." (App. at 227.) Workman also testified that when he saw Howell again after the shooting, Howell showed him a handgun, as well as a "Mason ring" he had taken from Allen. (App. at 248.) On cross-examination, numerous inconsistencies in Workman's testimony were exposed. For example, in his original statement to police, he claimed that he was walking alone on Huntingdon Street when he heard the gunshot, that Parnell was on the other side of the street, and that he did not know who the shooter was. Confronted at trial with those changes to his story, Workman said he had lied in his original statement.

During its case-in-chief, the Commonwealth also called Arlene Williams. She testified that, the morning after the shooting, Howell visited her and told her that he had shot someone on Huntingdon Street, and he showed her the .22 caliber gun he had used. She further testified that Howell told her he had taken a Masonic ring from Allen, and he showed the ring to her.

Cheryl Jones was called in rebuttal and largely confirmed Karla Hearst's testimony. She was with Hearst, heard a gunshot, and then saw a man fleeing from the direction of the sound, though she did not recognize him. She corroborated Hearst's statement that the man was wearing a beige jacket, and she also said he was wearing black and white Adidas shoes. A beige jacket and pair of black and white Adidas were recovered from Howell on the day of his arrest.

5

Also in its rebuttal case, the Commonwealth called Warren Wright to the witness stand. He claimed to be acquainted with Howell. He said that he had encountered Howell at a party the same night as the shooting. According to Wright, Howell asked if the police were still around the crime scene and said he wanted to know because he "just got a dead body." (App. at 348.) Wright also testified inconsistently regarding his whereabouts at the time of the shooting, alternately saying he was at the scene and then denying he was there.[1]

Howell testified in his own defense. He claimed that he, his sister, and his mother had all gone to a toy store that evening to buy a toy for his niece for Christmas. That testimony was corroborated by his sister and mother, who said they were at the store until approximately 8:15 p.m. and then went to a diner to eat. Howell admitted to being at the party where Wright claimed to have met him but claimed he spoke only to Parnell while there.

The jury ultimately convicted Howell of robbery and second-degree murder. He was sentenced to life imprisonment and then began his long journey through the appellate and collateral review processes. After failing to

---

[1] The prosecution called additional witnesses. Some police officers testified about the investigation and the lack of physical evidence. The medical examiner testified, and, though not a ballistics expert, opined that the bullet that killed Allen was a .22. Allen's father testified that his son belonged to a Masonic organization and had a ring with a symbol of that organization on it.

6

overturn his convictions on direct appeal, Howell filed his first collateral attack under Pennsylvania's Post Conviction Relief Act ("PCRA"). It was denied, and that denial was affirmed by the Superior Court. The Pennsylvania Supreme Court refused him permission to appeal further. There were then additional state-court collateral proceedings, none of which achieved the relief Howell sought. That was so even though, in 1999, Parnell confessed to Allen's murder, and Howell attached a copy of that written and sworn confession to the PCRA petition he filed that year.[2] The petition was dismissed as time-barred and not containing new evidence because, the PCRA appeal court said, Howell knew at the time of trial that Parnell had committed the murder.[3]

---

[2] In 1999, Parnell wrote several letters in which he confessed to murdering Allen. He sent them to Howell's former post-conviction counsel, to a judge on the Court of Common Pleas, and to various other people. In the letters, he said that, while high, he had attempted to collect drug money from Allen and ended up killing him. He said he then made up a story pinning the murder on Howell and had his friends corroborate it. Parnell also claimed that he was thereafter arrested for another shooting, which he committed because the victim was telling people what he had done to Allen. Parnell signed a notarized affidavit containing his confession.

[3] The Pennsylvania Superior Court's nothing-new-here rationale is curious. The court concluded that Howell "knew Parnell's identity at the time of trial in 1983" and "attempted to implicate Parnell in the crime in his examination of witnesses." (Supp. App. at 10.) It thus ruled that Parnell's confession was not "a fact that was unknown to [Howell] [which] could not have been ascertained by the exercise of due diligence." (Supp. App. at 9.) But seeking to create

After the dismissal of his final PCRA petition, Howell filed a habeas petition in federal court in 2005. The District Court dismissed it as time-barred. We denied a certificate of appealability, concluding that, even assuming that a showing of actual innocence could excuse untimeliness, Parnell's affidavit alone was insufficient to make such a showing and thus relief was unwarranted.

In May of 2014, Howell tried again, filing a motion to reopen the habeas judgment, based on the Supreme Court's decision in *McQuiggin v. Perkins*, 569 U.S. 383 (2013). That case held that a showing of actual innocence provides an equitable exception to AEDPA's statute of limitations. *Id.* at 392. Howell argued that he was actually innocent and that *McQuiggin* constituted a change in law entitling him to relief under Federal Rule of Civil Procedure 60(b)(6).[4] This time, his claim of innocence was supported not only by Parnell's confession, but also by the more recent recantation of Arlene Williams. In August 2009, Williams signed a notarized affidavit recanting her trial testimony. She swore that, contrary to her trial testimony, Howell never visited her on the morning after the murder, that he did not confess to the

---

reasonable doubt at trial is a far cry from knowing who actually committed the crime in question. And the confession from Parnell – a confession that didn't exist in 1983 – was in fact new when it was presented to the PCRA court.

[4] That rule states, "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for… any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

murder, and that he never showed her a gun or a ring. She stated that she had lied because the police told her that, if she didn't implicate Howell, they would charge Parnell for the crime. She had wanted to protect Parnell because he is the father of her child.

The District Court denied Howell's motion, ruling that the change in the law caused by *McQuiggin* "does not provide the extraordinary circumstance necessary to afford relief under Rule 60(b)." (App. at 121.) In the alternative, the Court denied the motion on the merits, stating that the evidence Howell proffered was insufficiently reliable to meet the standard for proving actual innocence.

A few years later, we came to a different conclusion about whether *McQuiggin* opened the door to relief under Rule 60(b)(6). In *Satterfield v. District Attorney of Philadelphia*, 872 F.3d 152 (3d Cir. 2017), we said that "if a petitioner can make a showing of actual innocence, *McQuiggin*'s change in law is almost certainly an exceptional circumstance" entitling a petitioner to relief under Rule 60(b)(6). *Id*. at 163. That prompted Howell to again move for Rule 60(b)(6) relief, and this time he added two more recantations in support, from Karla Hearst and Cheryl Jones. Both Hearst and Jones provided affidavits in which they claimed that the fleeing man they saw on the night of the murder was actually Parnell. They stated that they had lied at trial out of fear of Parnell and due to police coercion.

The District Court again denied relief. It decided that Parnell's confession was unreliable because, when he authored it, he was serving a term of life without parole and so "had nothing to lose by confessing." (App. at 6.) The

9

Court said that the Supreme Court's ruling in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), that juveniles could not constitutionally receive a life sentence (Parnell was a juvenile when convicted) did not make the confession more reliable because Parnell had not reaffirmed his confession after that ruling.[5] The Court also rejected the Hearst and Jones affidavits out of hand, concluding that they were "nothing more than highly suspect recantation evidence." (App. at 4.) In the Court's view, the timing of the affidavits was suspicious too, since they had been authored in 2014 but were only presented years later.

Howell next turned to us for a certificate of appealability and we granted it, limited to the issue of "whether [he] ha[d] made a sufficient showing of innocence to be entitled to relief based on the Supreme Court's decision in" *McQuiggin* "and, therefore, whether the District Court was correct in its procedural ruling."[6] (App. at 7.)

---

[5] In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that sentencing juveniles to mandatory life in prison without the possibility of parole violated the Eighth Amendment's prohibition against cruel and unusual punishments. *Id.* at 479. The Court subsequently made that ruling retroactive, and thus applicable to previously convicted defendants such as Parnell, in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016).

[6] We have required litigants to obtain a certificate of appealability to appeal from all rulings in the context of Rule 60(b) motions in habeas actions, whether they are "true" Rule 60(b) motions or are unauthorized second or successive habeas petitions. *See Morris v. Horn*, 187 F.3d 333, 339 (3d

10

## II.    DISCUSSION[7]

The overarching question in this case is whether Howell has made a sufficient showing of actual innocence to gain relief under Rule 60(b)(6) – relief that would serve as a gateway past the procedural default of his having untimely filed his habeas petition, thus allowing the petition to be considered.  In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court established the analytical framework for addressing such a question.[8]  The required showing is usually

---

Cir. 1999).  We have also recognized that "the vitality of [the holding in *Morris*] is undermined somewhat by the Supreme Court's decision in *Harbison v. Bell*," *see Wilson v. Sec'y Pa. Dep't of Corr.*, 782 F.3d 110, 115 (3d Cir. 2015), where the Supreme Court stressed that 28 U.S.C. § 2253(c)(1)(A) "governs final orders that dispose of the merits of a habeas corpus proceeding," 556 U.S. 180, 183 (2009).  Nevertheless we have declined "to revisit [the] decision in *Morris*," *Wilson*, 782 F.3d at 115, and the Supreme Court subsequently assumed without deciding that a certificate of appealability is required to appeal from a district court's disposition of a habeas petitioner's Rule 60(b) motion, *see Buck v. Davis*, 137 S. Ct. 759, 772 n.* (2017).  As *Harbison*, *Wilson*, and *Buck* have not resolved this issue, *Morris* remains the law of this Circuit.

[7] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254.  We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

[8] Ordinarily, we review a denial of a Rule 60(b)(6) motion for abuse of discretion.  *Satterfield*, 872 F.3d at 158.

11

discussed as having two steps: first, the petitioner must present "new reliable evidence" of actual innocence,[9] *id.* at 324; and then, second, that evidence must "persuade[] the district court that … no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt." *Satterfield*, 872 F.3d at 163 (quoting *McQuiggin*, 569 U.S. at 386). If a petitioner meets that *Schlup* standard, relief under Rule 60(b)(6) is warranted, and the habeas petition can be considered on the merits despite a procedural default, "unless the totality of equitable circumstances ultimately weigh heavily in the other direction." *Id.*

---

But "[w]e review *de novo* whether a petitioner's evidence is sufficient to satisfy *Schlup*." *Munchinski v. Wilson*, 694 F.3d 308, 337 (3d Cir. 2012); *see also Houck v. Stickman*, 625 F.3d 88, 93 (3d Cir. 2010) (reviewing district court's rulings regarding actual innocence de novo because no evidentiary hearing was conducted). That is consistent with the well-settled rule that we have plenary review of the application of legal standards to facts. *See In re 15375 Mem'l Corp.*, 589 F.3d 605, 616 (3d Cir. 2009) (stating that an "application of law to fact" is "subject to plenary review because it is, essentially, a conclusion of law").

[9] "In this context, actual innocence refers to factual innocence, not legal insufficiency." *Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018). The analysis is thus "not limited to the existing record[,]" and consideration of "any admissible evidence" is proper. *Bousley v. United States*, 523 U.S. 614, 624 (1998).

12

As just noted, the first step under *Schlup* is the proffer of "new reliable evidence" pertaining to the petitioner's claim. *Schlup*, 513 U.S. at 324. That step thus contains two sub-parts: the evidence must be both "new" and "reliable." Neither party here disputes that Howell's evidence is new. The question is whether it is reliable, and the District Court said no, it is not.

In *Reeves v. Fayette SCI*, 897 F.3d 154 (3d Cir. 2018), we explained that, "[a]s part of the reliability assessment of the first step [of the analysis under *Schlup*], the [district] court may consider how the timing of the petitioner's submission and the likely credibility of the witnesses bear on the probable reliability of that evidence, as well as the circumstances surrounding the evidence and any supporting corroboration." *Id.* at 161 (internal quotation marks and alterations omitted). The District Court here, however, did not take into account those or any other considerations while assessing the reliability of Howell's evidence. Rather than undertaking an individualized analysis of the proffered evidence, the Court dismissed the recantations on a categorical basis. Specifically, it rejected the Williams affidavit because "the general suspicion of recantation testimony rendered [it] unreliable." (App. at 4.) It similarly dismissed the Hearst and Jones affidavits as "nothing more than highly suspect recantation evidence[.]" (App. at 6.) The Court went on to note two additional reasons for questioning those latter affidavits – that they were made in 2014 but not presented to the court for "approximately four years[,]" and that they were "nearly identical[.]" (App. at 6.)

The Court also discounted Parnell's confession. As before noted, Parnell wrote several letters from prison in 1999

13

confessing to the murder of Allen. He later swore to his confession in an affidavit. But the District Court concluded that the confessions were unreliable because Parnell was serving a life sentence and thus had nothing to lose by confessing to an additional murder. It further determined that the Supreme Court's decision in *Montgomery*, holding that a sentence of life without parole is unconstitutional if imposed on juveniles, did not change that conclusion even though it potentially rendered Parnell eligible for relief. That was so, the Court reasoned, because Howell provided no evidence that Parnell actually obtained relief under *Montgomery* and because Parnell had not reaffirmed his confession after *Montgomery*.

The District Court was quite right that "[c]ourts have historically viewed recantation testimony with great suspicion." *Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988). As a general matter, a recantation in the absence of corroborating evidence or circumstances will probably fall short of the standard of reliability contemplated by *Schlup*. But that does not mean that recantation evidence is to be categorically rejected. On the contrary, "there are no categorical limits on the types of evidence that can be offered" under *Schlup*. *Hyman v. Brown*, 927 F.3d 639, 660 (2d Cir. 2019). Like any other form of evidence, recantations should be analyzed on an individual and fact-specific basis, taking into account the non-exclusive factors outlined in *Reeves*.

In declaring the recantations here to be unreliable simply because they are recantations, the District Court's *Schlup* analysis went astray. And the added reasons provided for rejecting the Hearst and Jones affidavits – namely their

14

late submission and similarity – also give cause for concern. While it is true that four years elapsed between the execution of the affidavits and their presentation to a federal court, and true too that such a delay may cut against a finding of reliability, *Reeves*, 897 F.3d at 161, Howell did present the various affidavits to state courts in PCRA petitions shortly after obtaining them. Moreover, Howell seeks relief based on the 2017 change in law brought about by our decision in *Satterfield*, which corrected the District Court's misunderstanding that *McQuiggin* could not constitute extraordinary circumstances to permit relief under Rule 60(b)(6). Even armed with new recantation evidence, Howell needed that course correction in the law to have a hope for relief. Thus, the delay in presenting the evidence to a federal court is not as suspicious as it might at first seem. Nor does the "identical" nature of the Jones and Hearst affidavits necessarily cut against their credibility, as the District Court concluded. One plausible reason that the affidavits are so similar is that they are both telling the truth.

The substance of the several affidavits is troubling enough that an evidentiary hearing is warranted. Not only did Jones and Hearst recant their testimony condemning Howell, they also implicated Parnell – an alternative suspect who has confessed to the crime under oath and who was convicted of another shooting around the same time as Allen's murder.[10] Williams's recantation also obliquely implicates Parnell when it says that she lied about Howell to protect Parnell from prosecution for Allen's murder.

---

[10] Parnell's associates murdered Workman to prevent him from testifying against Parnell at Parnell's murder trial. *State v. Lumumba*, 601 A.2d 1178, 1179 (App. Div. 1992).

15

We do not suggest that the available evidence is all in Howell's favor. There are aspects of Jones's original trial testimony that were corroborated. For example, she testified that the person she saw fleeing wore a beige jacket and black and white Adidas sneakers, and Howell had articles of clothing matching that description. Yet allowing for a more informed consideration of the competing versions of Jones's account, and the sworn statements given by other surviving witnesses, is precisely why an evidentiary hearing should be held. Evidence such as the Jones, Hearst, and Williams affidavits, if credited, "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime,]" and can thus "suffice to show actual innocence." *Reeves*, 897 F.3d at 161 (alterations in original) (quoting *Goldblum v. Klem*, 510 F.3d 204, 233 (3Cir. 2007)). When they are combined, their effect becomes more potent and the need to assess them with care grows, particularly since physical evidence in the case was practically nonexistent and so much rides on the testimony of these witnesses.

Parnell's confession is also obviously significant and, as buttressed by the recantation of other witnesses, deserves another look as well. That is especially so since Howell argues that one of the reasons given by the District Court for rejecting the confession appears to be mistaken. The Court said Parnell was in prison for life anyway and thus had nothing to lose by confessing, but Howell asserts that on October 17, 2017, Parnell's sentence was reduced to 33 years to life and that Parnell was released from prison on September 6, 2019. So the possibility that he did in fact receive meaningful relief under *Montgomery* and does have something to lose by confessing to an additional murder

16

warrants additional exploration. It is nevertheless true, as the District Court observed, that Parnell has not reaffirmed his confession in the aftermath of *Montgomery*. That, however, is a further reason to conduct an evidentiary hearing, rather than a reason not to. Parnell should be brought in and placed under oath again so that he can reaffirm his confession if he chooses to, or can change his story once more.

In sum, Parnell's confession corroborates the Jones, Williams, and Hearst affidavits. And the multiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others. On remand, the District Court should evaluate the interlocking corroboration to determine whether the evidence Howell presents is sufficiently reliable and persuasive under *Schlup* for a gateway showing of actual innocence. It should be helpful to hear the live testimony of Hearst, Williams, Jones, and Parnell in order to judge their credibility on the stand, rather than only through their affidavits. Such a hearing would also give the parties the opportunity to supplement the record as necessary, aiding the District Court in its analysis.[11]

---

[11] Nothing we have said here is meant to suggest how the Court should assess the reliability of the new evidence or ultimately decide Howell's Rule 60(b)(6) motion. The foregoing discussion is provided simply to demonstrate that not only is recantation evidence not categorically unreliable, but, in this particular case, it has sufficient facial plausibility to warrant an evidentiary hearing. We leave it to the District Court in the first instance to determine whether Howell's new evidence is reliable, whether he has satisfied the second step

## III. CONCLUSION

For the foregoing reasons, we will vacate the order denying Howell's Rule 60(b)(6) motion and will remand to the District Court for an evidentiary hearing on the reliability of his new evidence.

---

of the *Schlup* analysis, and whether the totality of the equitable circumstances weigh heavily against granting relief.